1      IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF TEXAS
2        HOUSTON DIVISION

3

UNITED STATES OF AMERICA   )
4             )
v.          )   NO. H-11-CR-722-1,2
5           )   July 28, 2014
ABRAHAM MOSES FISCH, ET AL  )
6

7
           HEARING
8     BEFORE THE HONORABLE LEE H. ROSENTHAL

9

10

11

12 For the Government:   Mr. Robert S. Johnson, AUSA
           Mr. John P. Pearson, AUSA
13          U. S. Attorney's Office
           1000 Louisiana, Suite 2300
14          Houston, Texas 77002

15 For Defendant Fisch:   Mr. Norman Silverman
           Silverman Law Group
16          917 Franklin, 4th Floor
           Houston, Texas  77002
17

18 For Defendant Bertman:  Ms. Regina Bacon Criswell
           Attorney at Law
           7803 Bent Briar
19          San Antonio, Texas  78250

20          Mr. Paul H. Doyle
           Paul Doyle & Associates, PC
21          440 Louisiana, Suite 2300
           Houston, Texas  77002
22

 Court Reporter:    Bruce Slavin, RPR, CMR
23

24

Proceedings reported by mechanical stenography and produced
25 by computer-aided transcription.

```
 1              THE COURT:  Go ahead and state your appearances and
 2       then you may be seated.
 3              MR. JOHNSON:  Robert Johnson for the government.
 4              MR. PEARSON:  John Pearson for the United States.
 5       Good morning, Your Honor.
 6              MR. SILVERMAN:  Your Honor, Norm Silverman for
 7       Mr. Fisch, the late filer.
 8                  I am sorry about that.  I worked on that all
 9       weekend, and when I converted it to a PDF I gave it a
10       similar name and I messed up when I clicked on my PDF to
11       file.  So, I'm very sorry.
12              THE COURT:  Thank you.
13              MR. SILVERMAN:  Yes, ma'am.
14              MS. CRISWELL:  Regina Criswell for Monica Bertman.
15              MR. DOYLE:  Paul Doyle.
16              THE COURT:  Thank you.  You may all be seated.
17                  So, what's the most efficient way to present
18       the issues we have to deal with this morning?
19              MR. JOHNSON:  Judge, I think we should start with
20       the conflict issue, resolve that, and then we can --
21       depending on how that's resolved, then we can decide how
22       to --
23              THE COURT:  And now we have, apparently, two
24       conflict issues.  Obviously, the larger elephant is the
25       Silverman elephant, but, apparently, we also have an issue
```

11:33 (line 5)
11:33 (line 10)
11:33 (line 15)
11:33 (line 20)
11:33 (line 25)

1    with respect to Mr. Hinton.

2              And I do notice that Mr. Portillo's counsel is

3    also present.

4              MS. MUSICK:  Yes, Your Honor.

11:34   5              THE COURT:  Go ahead and state your appearance.

6              MS. MUSICK:  JoAnne Musick for Mr. Portillo.

7              THE COURT:  All right.  Very good.  Thank you.  I

8    appreciate your being here.

9              All right.  So, let's start with the

11:34  10    government presenting its view of where we are right now,

11    and then I will hear from counsel for Mr. Portillo, and then

12    I will hear from Mr. Silverman.

13              MR. SILVERMAN:  Yes, Your Honor.

14              THE COURT:  And I don't know if any of this bears

11:34  15    on the co-defendant.

16              MS. CRISWELL:  I don't think so, Your Honor.

17              THE COURT:  All right.  Thank you.  In which case,

18    I won't solicit response.  If you have one, of course, let

19    me know.

11:34  20              MR. JOHNSON:  Your Honor, on the conflict issue,

21    the question is whether Mr. Silverman's representation on

22    the forfeiture matter for Mr. Portillo is -- the initial

23    question is whether that matter is substantially related to

24    this case.

11:35  25              THE COURT:  So, is it your position on behalf of

1    the government that this  a) is a conflict and, if so, is it

2    actual or potential?

3         MR. JOHNSON:  Your Honor, our position is that it

4    is a conflict and it is an actual conflict.

11:35    5         THE COURT:  All right.

6         MR. JOHNSON:  And the background facts are:

7              There is a seizure from a bus of money.  There

8    are two couriers on a bus.  They were found to be

9    transporting money.  When they were sought by Houston Police

11:35   10    Department officers, they said that they were being paid a

11    thousand dollars by Portillo to transfer the money from

12    Atlanta to Houston.

13         THE COURT:  And give me a date so we have the

14    chronology.

11:35   15         MR. JOHNSON:  That was September 20, 2000.

16         THE COURT:  Okay.

17         MR. JOHNSON:  And, thereafter, forfeiture

18    proceedings, civil forfeiture proceedings, began regarding

19    the forfeiture of that money.

11:36   20         THE COURT:  And was Mr. Portillo's criminal case

21    then pending?

22         MR. JOHNSON:  No.  The investigation of Portillo

23    did not start until -- the federal investigation did not

24    start until around, I'd say, 2003, 2004.

11:36   25         THE COURT:  So, it was well before the federal

```
 1   investigation into Mr. Portillo.

 2             MR. JOHNSON:  It was.

 3             THE COURT:  Had he come to state law enforcement

 4   attention by then?

 5             MR. JOHNSON:  Yes, in multiple states.

 6                  This is one of the incidents that kicked off

 7   the investigation, ultimately.  And I can tell you that at

 8   trial in this matter -- I actually brought my trial notebook

 9   from the Portillo trial.  The first nine exhibits of the

10   trial binder are the bus seizure.

11                  And the way that we were going to prove that

12   this is Portillo's money is -- The courier said, 'We'll be

13   getting paid by Portillo,' but we couldn't put that into

14   evidence because it's hearsay.  The way to prove it was the

15   claim for seized property that Portillo filed in the civil

16   matter, and that's Exhibit 9 of the Portillo criminal case.

17                  And when I gave the opening statement --

18             THE COURT:  So, your position -- and I don't mean

19   to interrupt you, but I just want to make sure that I'm

20   understanding your argument.

21                  Your position is that you can't cabin the

22   forfeiture proceeding and issues and the representation of

23   Mr. Portillo in those matters.  You can't separate them in a

24   neat cabin from --

25             MR. JOHNSON:  Right.  They're intertwined.
```

1          THE COURT:  -- and divorce them, segregate them,

2    from the underlying criminal proceedings that came to

3    involve Mr. Fisch?

4          MR. JOHNSON:  Right.

11:37    5          THE COURT:  Okay.

6          MR. JOHNSON:  And that seizure was the first thing

7    that we talked about in opening in the Portillo trial, and

8    it's the first nine exhibits.

9               And Exhibit 9, if the Court would like to

11:38    10   review it --

11         THE COURT:  Yes.

12         MR. JOHNSON:  I will just give you the whole

13   notebook.  You can see the first nine exhibits.

14         THE COURT:  Okay.  Got it.  Thank you.

11:38    15        MR. JOHNSON:  And, so, the defense relies on the

16   *Burns* case, which I have read at least a little part of this

17   morning, and it looks to me like --

18         THE COURT:  Would you spell that for the court

19   reporter.

11:39    20        MR. JOHNSON:  *Burns*, B-u-r-n-s.

21         THE COURT:  All right.

22         MR. JOHNSON:  And it's cited in the defense's brief

23   they just filed.

24              From reading the *Burns* case, it looks to me

11:39    25   like the basis of that decision that there was no conflict

1    was that -- and I am quoting from the opinion -- "The facts

2    and issues of the previous representation had no relation to

3    the charges brought against Burns."  And, so, the previous

4    representation --

11:39    5        THE COURT:  Well, obviously, the relationship of

6    the subject matter of the multiple representations is a

7    critical factor in determining whether an actual conflict is

8    present.

9        MR. JOHNSON:  Right.  And, so, in *Burns* they found

11:39    10   that they're really not related, and our point is here that

11   they're not just related; it's, really, the same thing.  I

12   mean, that seizure was one of the bases for the criminal

13   prosecution of Portillo.

14       THE COURT:  When was the forfeiture -- What was the

11:39    15   status of the forfeiture proceeding in which Mr. Silverman

16   represented Mr. Portillo at the time of the criminal case in

17   which Mr. Silverman did not represent Mr. Portillo?  What

18   was their relationship back then?

19       MR. JOHNSON:  Well, I know that the --

11:40    20       THE COURT:  I didn't say that very well.  I know

21   that you're telling me that the way you were going to try

22   the criminal case involved the forfeiture case.

23       MR. JOHNSON:  Right.  And that, clearly, the claim

24   had already been filed back in 2001, I think is the date on

11:40    25   that Exhibit 9.  And I know that the forfeiture action was

1    stayed for a period of time because of the criminal

2    investigation.

3            THE COURT:  Obviously, it wasn't resolved until the

4    guilty plea in the criminal case.

11:40   5        MR. JOHNSON:  Right.  And that's what was offered.

6            So, that's Point No. 1.  We believe they're

7    closely related and intertwined.

8            And Point No. 2 is that we believe that

9    Mr. Silverman really does have confidential information in

11:41   10   his possession from Mr. Portillo, and he essentially sets

11   that out in his motion.  He says that Portillo told him

12   repeatedly this money is not drug proceeds; it's from his

13   club.  Well, it turns out those are misrepresentations and

14   those are statements that Portillo made to his attorney.

11:41   15       THE COURT:  I was troubled by them, because these

16   are statements of what Mr. Portillo told Mr. Silverman in an

17   attorney-client relationship, when Mr. Portillo has said, in

18   a filed document in this court, 'I'm not waiving my

19   privilege.'  Mr. Silverman can't waive the privilege for

11:41   20   him.

21           MR. JOHNSON:  Right.

22           THE COURT:  So, I was very troubled to see those

23   statements, to see Mr. Silverman repeating what his client

24   had told him when Mr. Silverman's client hasn't waived the

11:42   25   prohibition against Mr. Silverman doing that.

1          MR. SILVERMAN:  If I may, Your Honor.

2          THE COURT:  You will, but not yet.

3          MR. SILVERMAN:  Yes, ma'am.

4          THE COURT:  I am alerting you.  I'm worried.

11:42    5          MR. SILVERMAN:  Very well.

6          MR. JOHNSON:  Well, since 2009, when Portillo pled

7    guilty, we know that those statements must have been false.

8    He pled -- part of his plea was to that seizure.  That was

9    part of the underlying evidence, and I believe that that was

11:42   10    part of the facts read into the record on the plea colloquy,

11    if I remember correctly.

12              And, so, those are, I think, the two main

13    things that distinguish this case from the *Burns* case upon

14    which the defense relies.

11:42   15          THE COURT:  How do you think that the -- What is

16    the government's view of the risk if Mr. Silverman

17    continues -- I mean, I have got a waiver from Mr. Fisch.  I

18    obviously have, under the law, the ability to accept or --

19    the discretion --

11:43   20          MR. JOHNSON:  Right.

21          THE COURT:  -- to accept or decline that waiver.

22    If I were to accept the waiver, what does the government

23    view as the potential for conflict if the trial proceeds

24    and, as expected, Mr. Portillo is the star witness against

11:43   25    Mr. Fisch or a star witness against Mr. Fisch and

1    Mr. Silverman is called upon to cross-examine him?

2           MR. JOHNSON:  I don't think there's, frankly, much

3    danger to the Fisch case.

4           THE COURT:  Tell me what you mean by that.

11:43   5           MR. JOHNSON:  Well, you know, if anything, the

6    confidential information in Mr Silverman's possession gives

7    him an advantage in cross-examining Portillo.  It doesn't

8    really prejudice Fisch.  It prejudices Portillo.

9           THE COURT:  Does Mr. Silverman have the ability to

11:44   10   use that information given Mr. Portillo's refusal to waive

11   the privilege?

12          MR. JOHNSON:  And that's a good question.  I hadn't

13   thought of it in those terms.

14                It may not, and it may be that Mr. Silverman

11:44   15   now has to stay away from that whole set of issues, and he

16   may not be able to cross Portillo about the fact that

17   Portillo was claiming, originally, that the money was

18   legitimately earned from his nightclub business and then

19   ultimately pled guilty and made it clear that it was not

11:44   20   earned by his nightclub business.

21          THE COURT:  So, if Mr. Silverman were to put a

22   filter in place that says 'I can't use anything that

23   Mr. Portillo told me in confidence during the course of our

24   relationship in cross-examining him when he attempts to' --

11:45   25   'when he testifies against my client, Mr. Fisch' -- Assuming

1    that can be done effectively without opening up an

2    ineffective assistance risk to Mr. Fisch -- "assuming" --

3    does that -- if we got an independent lawyer, a separate

4    lawyer, either for the whole case or for cross-

5    examination -- some courts have dealt with situations like

6    this in that fashion -- a few.  Of course, those lawyers

7    wouldn't have access to that kind of information from

8    Mr. Portillo in the first place.  So, it doesn't

9    disadvantage Mr. Silverman, in a sense, because it puts him

10    at the same playing field, although I guess the question

11    then is he doesn't know information that was told to him

12    solely in confidence and information that may have been

13    shared with others as well that he could have used, but he

14    learned of it as the lawyer as opposed to through some other

15    means; so, he might be disadvantaged and you just don't

16    know.

17         MR. JOHNSON:  And I don't know what information was

18    told to him either.

19         THE COURT:  That might have been available

20    elsewhere or might not have been.

21         MR. JOHNSON:  Right.

22         THE COURT:  So, is there any -- as you have read

23    the cases -- and I assume that we have all read the same

24    cases -- what is the closest case in which the individual

25    who is the basis for the conflict, the client in the prior

1    representation -- when that client refuses to allow a waiver

2    and the use of any information gained from that client at

3    all or information learned about that client in the course

4    of the representation -- what do the cases -- what's the

11:47  5    best case?

6         MR. JOHNSON:  Yeah.  Unfortunately, I can't really

7    point the Court to any analogous case.  My time to research

8    this is relatively limited, but --

9         THE COURT:  I guess my question is this.  Is there

11:47  10   any case in which that occurs in which courts have not found

11   conflict?

12        MR. JOHNSON:  That I have not seen, but that

13   doesn't necessarily mean it hasn't happened, and I am happy

14   to spend some more time looking if the Court would like me

11:47  15   to.

16        I do agree -- I think the *Burns* case is -- in

17   terms of the situation, it's relatively close.  It doesn't

18   involve forfeiture, but I think it distinguishable for

19   reasons we talked about, but that doesn't really involve the

11:48  20   client asserting the issue, the conflict.

21        THE COURT:  Do you know, from the government's

22   perspective -- Mr. Portillo, as I understand it, pleads

23   guilty in May of 2009.  Final judgment is entered in

24   February, 2010.

11:48  25        Are you aware of -- was the forfeiture case

1    resolved as part of the same global arrangement?

2         MR. JOHNSON:  The forfeiture case was resolved as

3    part of the Portillo case, and that includes $100,000,

4    approximately, that was seized at the bus station.

11:48    5         It was an odd plea process.  There was no

6    written plea agreement, it was an oral plea, because of the

7    strange information that we received right after opening

8    statements; and, so, the defense lawyers wanted their

9    clients to enter a plea quickly, and Judge Hughes wanted a

11:49   10    plea entered.  So, there is no written plea agreement.

11    There is a document filed later that addresses -- that I

12    believe is a preliminary order of forfeiture.

13         THE COURT:  So, obviously, Mr. Portillo, serving a

14    lengthy sentence, I assume --

11:49   15         MR. JOHNSON:  Yes.  Well, he hasn't been sentenced

16    yet, but his range is life.

17         THE COURT:  So, there was obviously a decision made

18    to defer sentencing in the hope that he might provide

19    additional information and, from his perspective, earn an

11:50   20    opportunity for a lower sentence.

21         MR. JOHNSON:  Correct.

22         THE COURT:  Okay.  Sentencing still not scheduled?

23         MR. JOHNSON:  I think it may be tentatively

24    scheduled, but it's --

11:50   25         THE COURT:  -- for after this matter.

1    MR. JOHNSON:  -- postponed until this proceeding is

2  over.

3    THE COURT:  So, obviously, Mr. Portillo even has a

4  lot of incentive to testify -- and this will be the subject

11:50    5  of cross-examination -- to testify adversely to his prior

6  lawyer, Mr. Fisch, and his prior lawyer's client, Mr. Fisch.

7  It's sort of a double whammy.  This case gets more and more

8  interesting.

9    MR. JOHNSON:  I don't think Portillo has a problem

11:50   10  testifying against Fisch at this point even though that's

11  his prior lawyer.  Obviously, there is no love lost there.

12    But I don't think he has any problem with the

13  representation he received from Mr. Silverman back at that

14  time.  In fact, he wanted Mr. Silverman to continue as his

11:51   15  lawyer in the criminal case, but Mr. Silverman didn't

16  because of a separate conflict -- not a conflict between the

17  forfeiture proceeding and the criminal proceeding but a

18  conflict between a representation that Silverman had

19  undertaken for another defendant.

11:51   20    THE COURT:  In the criminal proceeding?

21    MR. JOHNSON:  I believe so.

22    THE COURT:  Does the fact that Mr. Portillo has not

23  yet been sentenced and is testifying in the hope of a lower

24  sentence when that occurs -- does that impact in any way the

11:51   25  conflict analysis that I have to deal with?

1    MR. JOHNSON:  Well, I would say that Portillo

2    should not be placed in the unfair position of having his

3    former lawyer cross-examine him, who he had a confidential

4    relationship with and who he might be concerned confidential

11:52    5    information could be used against him.  I think that --

6    THE COURT:  Well, I guess here's my question.  What

7    kind of continuing duty, if any, does Mr. Silverman have to

8    Mr. Portillo, whose goal is to testify truthfully,

9    obviously -- at least that's the question you're going to

11:52    10    ask him -- favorably to the government when Mr. Silverman

11    represents the defendant and Mr. Silverman's goal is to have

12    Mr. Portillo's testimony redound favorably to Mr. Fisch?

13    MR. JOHNSON:  I think the main --

14    THE COURT:  My question is continuing obligations

11:53    15    owed by Mr. Silverman despite the fact that the

16    representation has formally ended four years ago.

17    MR. JOHNSON:  I think there's a continued

18    obligation to keep confidential the communications between

19    lawyer and client, and those survive the representation.

11:53    20    THE COURT:  Any other duties that continue?

21    MR. JOHNSON:  There is a general duty of -- I think

22    there is a general duty of loyalty, but --

23    THE COURT:  That's my question.  Because the entire

24    point of avoiding the -- of determining whether there is a

11:53    25    conflict or whether to accept a waiver of a conflict is to

1    ensure the right to representation that is free from divided

2    loyalties.

3              So, that's the question.  Are there divided

4    loyalties?

11:53    5    MR. JOHNSON:  I think the rules -- you know, the

6    rules do allow a former lawyer to represent someone against

7    their former client in certain circumstances -- you know, if

8    the matters are not related -- under those circumstances.

9    So, there's not an absolute duty of loyalty.  It's narrowly

11:54   10   based on what the particular circumstances are; and, so, I

11   think it comes all the way back around to what the facts of

12   the situation are.

13             THE COURT:  Confidential information and the

14   subject matter of the representation.

11:54   15             MR. JOHNSON:  Right.  The closeness of the subject

16   matter.

17             THE COURT:  Clearly, Fisch and Portillo have

18   totally divergent interests, conflicting interests, here.

19             MR. JOHNSON:  Portillo doesn't have a problem

11:54   20   testifying.

21             THE COURT:  Again, that's my point, because -- And

22   if Mr. Silverman is hampered in his ability to cross-examine

23   Mr. Portillo in attempting to protect Mr. Fisch, that would

24   be, in part, your argument about divided loyalty and

11:55   25   improper --

1          MR. JOHNSON:  And that affects his representation

2     of Mr. Fisch.

3          THE COURT:  Anything else on that that would be

4     helpful for me to consider?

11:55   5          MR. JOHNSON:  I would just say that, you know, if

6     it turns out the Court finds there is a conflict, I think

7     the possible ways to resolve it are either Mr. Fisch

8     continues representing himself on his own, as he's done

9     previously for the last --

11:55   10          THE COURT:  For 14 months.

11          MR. JOHNSON:  -- few years, a couple years at

12     least.  That's option one.

13              Option two is that he could hire another

14     lawyer.  I, frankly, would be concerned about another lawyer

11:56   15     coming in at this point and having about one week to

16     prepare.  I think that would be asking for a problem.  I

17     think the Court would need to give the new lawyer at least

18     the same amount of time that Mr. Silverman had, and the

19     Court has already found that under the circumstances of this

11:56   20     case that would be an adequate amount of time.  What I think

21     is not --

22          THE COURT:  Mr. Silverman had significant knowledge

23     about the case, evidence, at the time we had the hearing

24     last week.  I'm not sure how long it took him to get that

11:56   25     knowledge.

1          MR. JOHNSON:  I think what is not a good option is

2    postponing the case for months for a new lawyer to be hired,

3    which, you know, the Court has basically already ruled on

4    that the other day at the continuance hearing.

11:56   5          But there's no reason to think that this issue

6    of who is the lawyer going to be is going to stop just

7    because we get another lawyer in the case.  That lawyer

8    could then be fired at the last minute, and then we're right

9    back to who is the lawyer going to be.

11:57   10          So, I think we need to resolve it.  Whatever

11   way it's going to be, I don't think there should be a long

12   continuance as a result.

13          Thank you, Your Honor.

14          THE COURT:  All right.  Thank you.

11:57   15          Mr. Silverman -- Well, actually, first,

16   counsel for Mr. Portillo, please.

17          MS. MUSICK:  I was going to say "Good morning."  I

18   think it's "Good afternoon."

19          THE COURT:  We're on the cusp.

11:57   20          MS. MUSICK:  Yes.

21          First, I would just like to say, without sort

22   of rehashing everything, I don't disagree with anything that

23   the government has said thus far.  The forfeiture --

24          THE COURT:  I don't think I have ever heard you say

11:57   25   that before.

1       MS. MUSICK:  Probably not.

2               The exhibits from the trial with

3   Mr. Portillo's -- in his own case -- you know, a great deal

4   of the government's evidence dealt with that forfeiture and

11:58   5   sort of how the investigation started to evolve into

6   Mr. Portillo.  So, obviously, it's something that we weren't

7   prepared to litigate at trial.

8               And kind of as the government explained, the

9   trial -- that we started the trial and then it fell apart

11:58   10  there and we ended up with a plea.

11              The Court is correct.  We're waiting on

12  sentencing.  Mr. Portillo, obviously, does have interest in,

13  you know, testifying in this particular matter because, you

14  know, potentially, that could affect his sentencing in Judge

11:58   15  Hughes's court.

16              One thing that -- from Mr. Portillo's

17  perspective -- he and I have discussed this, and he has

18  indicated to me that he discussed this matter, including the

19  forfeiture -- or around the forfeiture with Mr. Silverman.

11:58   20  And so --

21              THE COURT:  Wait.  Define "this matter".

22              MS. MUSICK:  The forfeiture matter with

23  Mr. Silverman when Mr. Silverman was first hired to

24  represent Mr. Portillo back in 2000-2001.

11:59   25              THE COURT:  Okay.

1      MS. MUSICK:  His position to me has been that he

2  shared information with Mr. Silverman about that case and

3  the underlying facts of the forfeiture.

4      THE COURT:  And that -- I understand you're being

11:59   5  careful in the way you're talking, and I appreciate your

6  need to respect the confidentiality and the privilege, but

7  is your -- am I understanding you correctly that your

8  client's position is that, in talking with Mr. Silverman

9  about the forfeiture, he provided information that also bore

11:59  10  on the criminal case in which Mr. Fisch represented him?

11      MS. MUSICK:  Yes, Your Honor.  And my client has --

12  was originally at that -- As the forfeiture began and

13  Mr. Silverman was representing him, when the criminal

14  indictment came down, the original idea was to continue to

12:00  15  have Mr. Silverman represent him.  So, there were some

16  discussions there.

17      THE COURT:  So, basically, the conversation was

18  about the core underlying facts that gave rise to both the

19  forfeiture and the criminal case?

12:00  20      MS. MUSICK:  Correct.  Down the road that became an

21  issue when the indictment fell.

22      THE COURT:  Right.  Because the conversations with

23  Mr. Silverman continued about the indictment?

24      MS. MUSICK:  Correct.  There were conversations

12:00  25  about the indictment.  Mr. Silverman recognized a conflict.

```
 1          THE COURT:  And the conflict was what?

 2          MS. MUSICK:  Within the criminal case.  And I'm not

 3   aware of that particular conflict.  I know Mr. Silverman

 4   mentioned to me that there were conflicts so that he could

 5   not continue to represent Portillo in the criminal case,

 6   something that was unknown at the time of the forfeiture.

 7          That would be something Mr. Silverman would

 8   know.  I didn't get into that, as to what the actual

 9   conflict was.

10          So, Mr. Portillo was unable to hire

11   Mr. Silverman at that point on the criminal indictment.

12          THE COURT:  How far after the indictment did this

13   occur?

14          MS. MUSICK:  I am not exactly sure of the time

15   line, but Mr. Silverman then got Mr. Portillo in contact

16   with Stan Schneider, who --

17          THE COURT:  So, maybe we could pinpoint that date.

18   Do you know when that was?

19          MS. MUSICK:  I do not.  But Stan signed on to the

20   case pretty close to the indictment time.

21          THE COURT:  So, just within months?  Weeks?

22          MS. MUSICK:  Probably weeks.  That's my

23   recollection.

24          THE COURT:  Do you know the date when

25   Mr. Schneider --
```

12:01 5
12:01 10
12:01 15
12:01 20
12:02 25

1      MR. PEARSON:  We have got the docket here from the

2    Portillo case.

3      THE COURT:  Yeah.  Why don't you tell me when Stan

4    Schneider made his appearance in the criminal case in

12:02  5    relation to when the indictment issued.

6      MR. JOHNSON:  Portillo was arrested on the

7    complaint April 24, 2006.  Schneider appeared -- Stanley

8    Schneider appeared for Portillo on April 28th, 2006.

9      THE COURT:  So, several weeks later.

12:02 10      MR. JOHNSON:  Well, four --

11      MS. MUSICK:  Actually, four days later.

12      MR. JOHNSON:  -- four days later.

13      THE COURT:  I'm sorry.  I missed it.  It's four

14    twenty --

12:02 15      MR. JOHNSON:  4-28 Schneider appeared.

16      THE COURT:  What was the date of the arrest?

17      MR. JOHNSON:  4-24.

18      THE COURT:  A couple of days.  You're right.

19      MR. SILVERMAN:  Actually, it was exactly a couple

12:02 20    of days, Your Honor.  Mr. Schneider first appeared on 4-26.

21      MR. JOHNSON:  That's right.

22      THE COURT:  Got it.  Thank you.

23      MR. SILVERMAN:  Yes, Your Honor.

24      MR. JOHNSON:  And the indictment was filed

12:03 25    May 22nd, 2006.

1          THE COURT:  Got it.

2          MR. JOHNSON:  And was there another date?

3          THE COURT:  Go ahead.  When was the next lawyer who

4    appeared?

12:04    5          MR. JOHNSON:  Dick DeGuerin appeared July 12th,

6    2006.

7               All right.  So, Mr. Fisch moves to substitute

8    as counsel for Portillo November 22nd, 2006.  The order to

9    substitute is signed on --

12:04   10          MS. MUSICK:  -- 4-3-2007.

11          MR. JOHNSON:  Well, he substituted on November 27th

12   '06, and then he is terminated by court order April 3rd,

13   2007.  And then David Adler is appointed May 4th, '07, and

14   eventually Miss Musick is appointed.  But that's essentially

12:05   15   it.

16          THE COURT:  Got it.  That chronology is helpful.

17          MS. MUSICK:  If it matters at all, Your Honor, once

18   I was appointed -- and I am trying to recall that date.  I

19   was on the case for approximately a month, six weeks.  I was

12:05   20   subbed out by retained counsel, Mr. Scott Shearer, and then

21   when Mr. Shearer withdrew I was reappointed on Mr. Portillo.

22          THE COURT:  Very good.

23          MS. MUSICK:  And if I may, Your Honor, just one

24   other thing I made note of as you were discussing this with

12:06   25   the government.

1        You asked about a continued duty to

2   Mr. Portillo.  And just -- I know the Court had mentioned

3   possibly being able to sort of segregate that and have

4   Mr. Silverman, you know, "filter" himself if he were, you

12:06   5   know, to cross-examine and not include certain things.

6        I do think he has a duty not to disclose the

7   information that he has learned from Mr. Portillo or from

8   his representation of Mr. Portillo, but I think it extends

9   further than just not repeating that information or

12:06   10  disclosing that information.  I think it goes to not being

11  able to use that information in any way, not to develop

12  trial strategy, not to develop, you know, other witnesses.

13  I think that information is -- it's privileged and

14  confidential and can't be used for any purpose whatsoever,

12:07   15  including trial strategy.

16        I just wanted to -- I kind of made a note of

17  that as something that the Court might want to consider.

18        THE COURT:  That's helpful.  Thank you.

19        Okay.  Anything else that would be useful from

12:07   20  this side?  And then I will hear from Mr. Silverman.

21        MR. JOHNSON:  No, Your Honor.

22        THE COURT:  Mr. Silverman.

23        MR. SILVERMAN:  Yes, Your Honor.

24        All right.  So, I want to clear up the factual

12:07   25  basis surrounding the circumstances, but, as a threshold

1    matter before doing that, I wanted to deal with the Court's

2    earlier statement that I had done something wrong by

3    disclosing --

4         THE COURT:  Well, I was concerned about it.  I

12:07   5    didn't find any --

6         MR. SILVERMAN:  I want to address that.

7         THE COURT:  I didn't find anything wrong as a

8    formal finding.  I was raising it so that you would have the

9    opportunity to specifically address it.

12:08   10        MR. SILVERMAN:  Yes, Your Honor.

11            When I received Document 186, the Court's

12   order directing me to respond to the suggestion that a

13   conflict existed, I read that the conference will cover the

14   extent of Silverman's previous representation of the

12:08   15   potential witness.  And there was a briefing deadline,

16   which, of course, I had blown.  We have talked about that.

17   But, at any rate, I wanted to fairly and fully respond to

18   that and make the Court aware of the extent of my

19   representation of Mr. Portillo so that the Court could make

12:08   20   a just decision on this issue, and I thought that that would

21   have compelled me to disclose the extent of my relationship

22   with Mr. Portillo.  That's all I was attempting to do.

23            You know, when issues like this come up,

24   privilege versus full disclosure, it's always a sticky

12:09   25   matter.

1          THE COURT:  Yes, it is.

2          MR. SILVERMAN:  But I was just trying to make the

3    Court aware of the circumstances in my prior representation.

4          THE COURT:  And I think that's one of the issues

12:09   5    that identify what can be divulged, in the interest of the

6    disclosure and effective cross-examination, as opposed to

7    what can't be divulged, no matter how helpful, no matter how

8    illuminating, because of the privilege constraint that I

9    think is, as you say, sticky.

12:09   10          MR. SILVERMAN:  Yes, Your Honor.  Absolutely.  And,

11   so, that's what I am prepared to talk about.

12               Of course, the question of what can be

13   divulged during the trial and during cross-examination is

14   different than the question that we were talking about just

12:10   15   now, which was when a court orders someone to divide the

16   full extent --

17          THE COURT:  I did not order the disclosure of

18   privileged communications.

19          MR. SILVERMAN:  I understand.  So, let's talk about

12:10   20   whether those were, in fact, truly privileged

21   communications.

22               First of all, the time line.  I was not

23   representing Mr. Portillo in 2001, didn't know who he was,

24   didn't represent him in 2002, did not represent Mr. Portillo

12:10   25   at the time he made a claim to this money.  His lawyer at

1   that time was David Bires.

2                       Several days before Mr. Portillo and Mr. Bires

3   were scheduled for trial on the forfeiture Mr. Bires

4   withdrew because, I guess, he had a conflict.  And, so, that

12:11   5   is how I came to represent Mr. Portillo.  I replaced

6   Mr. Bires, and that was in 2003, if my memory serves me

7   correctly.

8                       When I met with Mr. Portillo he provided

9   documentation -- or he actually referenced -- explained that

12:11   10   this money was legal money, and then some friends or family

11   members or people that worked supporting his band provided

12   documents that tended to, in my --

13               THE COURT:  Are you describing to me what

14   Mr. Portfolio told you in your meeting with him when you did

12:11   15   become his lawyer?

16               MR. SILVERMAN:  I am describing to you what I filed

17   in his case and what I turned over to the government and the

18   government's theory.  You know, there's supposed to be a

19   specific complaint raised.  Silverman will have to

12:12   20   cross-examine the witness on a particular issue.  That's

21   what the burden is of the person asserting a harmful

22   conflict of interest.

23                       And, so far, the only thing I have heard is

24   that Silverman would be able to say that Portillo offered an

12:12   25   explanation for his possession -- or for his ownership of

 1    the funds.  Because they weren't seized from Portillo.  They

 2    were seized from two other people who told the police it was

 3    Portillo's money.

 4              The government is maintaining, because

12:12  5    Silverman was provided with a false exculpatory story for

 6    the origin of the money, that that would be the source of

 7    the conflict and that Silverman would then be able to

 8    cross-examine the witness with a false statement that no

 9    other lawyer would ever be able to have.

12:13 10              Well, if that is, in fact, the case -- The

11    materials I turned over to Miss Kempner are in the

12    possession of the government.  Those ought to be turned over

13    to any lawyer under *Brady* because they tend to show that

14    Mr. Portillo gave a false exculpatory explanation for his

12:13 15    ownership of the currency, and that is impeaching and that

16    is *Brady*.  And, so, I'm not in any better position than any

17    other defense lawyer handling this matter should be.

18         THE COURT:  I guess the question is whether you

19    will be in any worse position because you will be unable to

12:13 20    use anything you might have learned in the attorney-client

21    relationship that would be covered by confidentiality and

22    privilege.

23         MR. SILVERMAN:  I would think -- Well, first of

24    all, I wouldn't have any desire to introduce evidence or

12:13 25    testimony to the effect that I had been Mr. Portillo's

1    lawyer.  That doesn't favor Fisch and it's not necessary.

2              The fact of the exculpatory story is

3    marginally relevant, if at all.  This is not a case about a

4    forfeiture.  This is a case about an alleged obstruction of

12:14    5    justice by representation that either bribes would be paid

6    and the parties knew they wouldn't be paid, or it's a case

7    about alleged representations that the government would be

8    able to use information on a high level provided by

9    Mr. Portillo and others when, in fact, that was false and

12:15    10    the information was never provided to the government.

11              While the government's case against Portillo

12    might very well have started out with the seizure in the bus

13    station from the Mendoza people, that seems to me to be very

14    tangential and very marginally related at all to the

12:15    15    allegations against Mr. Fisch.

16              Mr. Fisch, if he wishes to, I would think,

17    could waive the appearance of a conflict, because we

18    maintain there is no actual conflict and he has, in my

19    pleading, indicated that that's what he wishes to do.

12:15    20              And, so, the question is are these matters

21    substantially related and do they give rise to an actual

22    conflict.

23              You know, I went over this all weekend,

24    because the civil cases go differently than the criminal

12:16    25    cases and yet you see civil cases, you know, citing -- you

1    see criminal cases occasionally citing civil cases on this

2    issue.

3              What I deduced from all of this, on Sunday,

4    was that in criminal cases the Sixth Amendment right to the

12:16  5    lawyer of one's choice can only be interfered with or in any

6    way impeded in the face of an actual conflict, and in this

7    case I don't perceive there to be an actual conflict.  The

8    reason I say that is because of the *Burns* decision.

9              In the *Burns* decision the analysis performed

12:16  10   by the circuit court was to determine whether there was an

11   actual conflict.  I have a copy.  Here's a copy of the *Burns*

12   case.

13             THE COURT:  Thank you.

14             MR. SILVERMAN:  It's interesting and, I would

12:17  15   think, dispositive of this issue that Mr. Fisch himself

16   represented Mr. Portillo and pursuant to that representation

17   Mr. Fisch debriefed Mr. Portillo not just about the

18   forfeiture but about all relevant conduct that the

19   forfeiture was a small part of.  Mr. Portillo, I am

12:18  20   imagining, told Mr. Fisch things well beyond the forfeiture;

21   and, so, the information that I would receive from Mr. Fisch

22   would be much more complete than any information I received

23   from Mr. Portillo regarding the forfeiture.

24             If Mr. Portillo or the government or

12:18  25   Mr. Portillo's lawyer would enlighten us as to what his

1    precise claim is beyond the fact that 'Mr. Silverman

2    advanced a false exculpatory justification for currency I

3    claimed to own' and, by the way, Mr. Silverman didn't

4    lightly -- even in the face of any exculpatory documents

12:19   5    provided, Mr. Silverman still contacted an independent

6    forensic financial expert to review what Mr. Portillo was

7    claiming and seeing if it, in fact, made sense, and that

8    expert tended to agree that there was a time line of events

9    that made sense and that Mr. Portillo's claim was a

12:20   10   plausible one.  So, Mr. Silverman was very cautious in

11   asserting the claims of Portillo and making sure that they

12   were, in fact, corroborated.

13              The Court had inquired as to the basis that

14   prevented Silverman from representing Portillo.  Let me

12:20   15   address that.

16              Silverman briefly represented a witness at the

17   time when the agents of the DEA had just left his home and

18   wanted to question him.  The witness consulted counsel.  And

19   Mr. Silverman, upon hearing the witness's story, advised the

12:21   20   witness to refrain from further conversations with the

21   government agents.  And Mr. Silverman sent a letter to the

22   DEA instructing them that he was that witness's lawyer for

23   this purpose and that the witness wished to invoke his right

24   to counsel and right to remain silent.

12:21   25              There was another defendant that Mr. Silverman

1    represented in another federal district that was arrested in

2    possession of a large sum of U.S. currency, and Silverman

3    litigated that Defendant's forfeiture in state court, went

4    up through the appellate process, obtained a reversal in the

12:22    5    court of appeals.   Then the federal government indicted the

6    person for money laundering.

7             Silverman filed and litigated a motion to

8    suppress the evidence, which was ultimately successful.   A

9    part of the evidence in that case suggested that the trailer

12:22    10   that that witness was pulling was actually owned or

11   registered to another person listed in the Portillo

12   indictment.

13             And, so, once all of this came to light, it

14   was apparent that I couldn't participate in Mr. Portillo's

12:22    15   case; and, so, I contacted Mr. Schneider and I arranged for

16   Mr. Schneider to visit with Mr. Portillo.   I explained to

17   Mr. Portillo that Stanley Schneider was my first boss when I

18   was in law school and I had a great deal of confidence in

19   him, and I strongly urged Mr. Portillo to enlist

12:23    20   Mr. Schneider as his lawyer, and he followed the advice.

21             If I had any inkling that my two-day

22   representation of Mr. Portillo on his criminal case and my

23   several-week representation of Mr. Portillo on his

24   forfeiture case --

12:23    25             THE COURT:   How many weeks did you represent him on

1    the forfeiture case?

2         MR. SILVERMAN:  Several weeks.  Technically -- on

3    the forfeiture, I was, technically, on it for a number of

4    years.

12:23    5         THE COURT:  Correct.

6         MR. SILVERMAN:  But what I actually did is I subbed

7    in and gathered the documents and sent the documents to

8    Mr. Angelillo, the forensic accountant, and --

9         THE COURT:  How many meetings did you have with

12:24   10   Mr. Portillo?

11        MR. SILVERMAN:  One, I believe, and on the

12   forfeiture, because I think it was someone else that brought

13   the documents to me.  And the reason I say that is because

14   there was a little summary sheet and it says 'Mr. Portillo

12:24   15   this' and 'Mr. Portillo that,' describing the documents.

16   And, so, it wasn't Portillo, then, that was providing those.

17   It was the person that gave me the summary sheet, which was

18   necessary to me because the documents were in Spanish

19   mostly.

12:24   20            And, so, then when the indictment came down in

21   the criminal case I --

22        THE COURT:  So, you only had one meeting?

23        MR. SILVERMAN:  On the forfeiture.

24        THE COURT:  Did you have other conversations in

12:24   25   which they weren't face-to-face meetings but --

1          MR. SILVERMAN:  I don't think I had them with

2    Mr. Portillo.  I think I had them with his representatives.

3    He had managers and different people that were familiar with

4    the circumstances surrounding his exculpatory justification

12:25   5    for owning the money.

6               I don't have a specific recollection, but if

7    somebody called me and said, 'I am charged in a federal

8    felony,' I would have certainly -- I think I would have

9    immediately gone to see that person, and I probably did.

12:25   10         THE COURT:  So, one meeting on the --

11         MR. SILVERMAN:  -- on the criminal.  I would think

12    I would have done that right away.

13              And I am certain that -- I have a specific

14    recollection about accompanying Mr. Schneider to

12:25   15   Mr. Portillo's initial appearance just in order to make sure

16    that Mr. Portillo was happy with Mr. Schneider, but I don't

17    think I really talked to Mr. Portillo then.  I do remember

18    talking to Mr. Braley from the U.S. Attorney's Office and

19    telling Mr. Braley that I concurred with the idea that I

12:26   20   shouldn't handle Mr. Portillo's case and that's why

21    Mr. Schneider would be handling it.

22              So, as I said, the forfeiture case was stayed

23    and I was the last lawyer on it.  So, I would have been the

24    lawyer, technically, for three or four years, but I didn't

12:26   25   do anything on it.  There was nothing to be done.

1       And when the money was ultimately forfeited to

2   the government, I didn't resist or oppose that in any way

3   because I wasn't Mr. Portillo's lawyer; and I just assumed

4   that either Mr. DeGuerin or Miss Musick, or whoever the

12:27   5   lawyer was, was the person in the position to decide what

6   the best disposition for the funds in that case were.  And,

7   so, I had nothing whatever to do with that decision.

8       The Exhibit 9, that is the claim that David

9   Bires filed.  I didn't make the decision with Mr. Portillo

12:27  10   about whether he should, in fact, make a claim to the

11   currency.  All I did was put the evidence together that

12   supported the claim that had been made, and that evidence

13   was turned over to Sue Kempner.  And, so, that evidence --

14   if the government's theory is that Mr. Portillo was not

12:27  15   truthful to me, then the government should tell any defense

16   lawyer that handles that case that Mr. Portillo made a false

17   statement about that so that he could be impeached.

18       I don't hear any other assertion of conflict

19   here.  If there is -- I don't want to do something wrong

12:28  20   here.  I don't want to be in a bad position of being in a

21   conflict of interest.  That's why I showed you everything I

22   had.  I want to do the right thing by Mr. Fisch.  I want to

23   do the right thing by Mr. Portillo.

24       I'm not entirely certain to what degree

12:28  25   Mr. Fisch's innocence depends on whether Mr. Portillo told

 1   the truth when he filed his claim with Mr. Bires or whether

 2   he told the truth when he provided those documents.  I don't

 3   know if the documents are genuine or an alternate source.

 4             People that enter into plea agreements

12:29  5   oftentimes agree to fold winning hands on sub-issues as part

 6   of a plea agreement even if they really were in the right on

 7   those issues.  I don't fault anybody for making those

 8   choices.  I have made them myself in the past on other

 9   cases.

12:29  10            But, at the end of the day, this is a case

11   against Fisch that is a case of obstruction of justice, and

12   it's Mr. Portillo and Mr. Imo and Mr. Herrera and it

13   involves this government operative, Mr. Williams, that made

14   representations that the jury would decide whether Fisch

12:30  15   reasonably believed or didn't believe.

16             It seems to me that whether Mr. Portillo

17   innocently had money or had drug money just is a very minute

18   part of the case against Mr. Fisch.  I don't know if it's

19   entirely necessary to even go into it from the defense

12:30  20   perspective.

21             If the Court felt that it was necessary, we

22   could certainly consider enlisting the services of yet

23   another lawyer to conduct the examination of Mr. Portillo,

24   and I certainly do not mind --

12:31  25            THE COURT:  Doesn't the fact that Mr. Portillo has

1    been presented or described to me as such a critical witness

2    affect the analysis and not tangential to the prosecution

3    against Mr. Fisch?

4           MR. SILVERMAN:  No.  I think not.  It's my

12:31  5    understanding that Mr. Portillo is the only government

6    witness -- or Mr. Portillo was in jail at all times; so,

7    Mr. Portillo didn't actually physically do things.  But I

8    understand the Portillo case is the only case that actually

9    has money going to Fisch and his trust account and then from

12:31  10   Fisch to Lloyd Williams.

11          And, if I am wrong about that, I am sure the

12   government will let us know.  I am just trying to digest

13   this voluminous amount of material; and, so, if I misspeak

14   something, it's just out of ignorance of the subject matter.

12:32  15   I am doing the best I can.

16          I will tell the Court also that now, based on

17   this conflict, I have spent the entire weekend reading cases

18   and trying to figure out if there really was a conflict and

19   if I would be in the wrong for attempting to represent

12:32  20   Mr. Fisch in light of what was raised.

21          The allegations were not sufficiently precise,

22   as the case law requires.  So, I have been trying to think

23   of every permutation.  And I actually thought of the

24   possibility, 'Well, gosh.  Maybe I would want to impeach

12:32  25   Mr. Portillo with the fact that he falsely gave an innocent

1   explanation at an earlier time.'  And after really thinking

2   about that long and hard -- I don't know if I -- I don't

3   think I -- I certainly wouldn't want to prove I was his

4   lawyer, and I don't -- I think the value of it is just --

12:33   5   pales in comparison to the issues at hand in this case, the

6   big issues.

7            But, yes, I can see that Mr. Portillo would

8   be -- Mr. Portillo and, I am imagining, Mrs. Portillo and

9   other people surrounding Portillo, the Portillo story, would

12:33   10   be a very large part of the government's case.

11            Now, another thing that I ran across while I

12   was doing this is the fact that -- If I am getting out of

13   the bounds of what the Court wants to now discuss, just tell

14   me and I'll stop.

12:34   15        THE COURT:  Don't worry.

16        MR. SILVERMAN:  But Mr. Hinton, according to these

17   302 forms, was --

18        THE COURT:  Well, this goes to your notice of

19   potential conflict with respect to Mr. Hinton.

12:34   20        MR. SILVERMAN:  Yes.

21        THE COURT:  I think that's a separate issue, and

22   we'll take it up, obviously, and deal with it, but I don't

23   think it bears on my resolution of your representation of

24   Mr. Fisch.

12:34   25        MR. SILVERMAN:  Okay.  Does the Court wish to have

1    Fisch affirmatively waive the conflict?

2              THE COURT:  I first need to make a determination of

3    actual conflict because that triggers the *Garcia* hearing.  I

4    think that's the right order in which to proceed.

12:34    5              MR. SILVERMAN:  Okay.  Well, if we're going to get

6    into -- because there is no motion to disqualify me.  This

7    is sort of an investigation that we're all conducting now

8    into the basis --

9              THE COURT:  An abundance of caution hearing.

12:35   10              MR. SILVERMAN:  Right.  An abundance of caution

11   hearing.  Good name.

12              Okay.  So, I am going to request, then, if

13   this blossoms into some sort of a *Garcia* situation, that

14   either Mr. Portillo, through his lawyer or the government

12:35   15   through its lawyers, specifically apprise me of exactly the

16   areas that they fear that this conflict would be harmful to

17   Mr. Portillo so that I can, number one, determine whether I

18   agree or disagree and, number two, what I would do in light

19   of these things.  I am kind of shooting in the dark and I

12:35   20   have done everything I can.

21              You had asked the government what the best

22   case was for them.  I want to give it to you because I want

23   you to be able to make a fully informed and fair decision

24   here.

12:35   25              I read the *Phillips* case which Judge Atlas

1  wrote.  And that was the situation where Mr. Nugent was

2  attempting to represent one defendant who was, I think, in

3  charge and Mr. DeGuerin, a lawyer in Mr. Nugent's office,

4  had previously tried another defendant.  And that was a

12:36  5  situation where one of those defendants -- Well, neither one

6  was passed because Mr. DeGuerin's client was convicted on

7  appeal, if I am remembering correctly.

8          Does the Court have the *Phillips* case at hand?

9  I have a copy if you don't.

12:36  10          THE COURT:  Just give me the cite.

11          MR. SILVERMAN:  All right.  It's 952 Federal

12  Supplement 480, 1996.

13          And, so, both the appeal of the previously

14  convicted defendant and the present defendant's trial were

12:37  15  being handled by the same law firm, and the defendant on

16  appeal also was to be a witness for the government, and that

17  defendant objected to the conflict.  Judge Atlas resolved

18  the issue against the representation of the Nugent client

19  that was then to go to trial.

12:37  20          I have read this opinion, and this is the one

21  that took so much time to go through and read the precedence

22  relied upon by Judge Atlas in reaching her decision.  The

23  question of substantial relation is one of the stickiest

24  issues.

12:38  25          THE COURT:  Yes.  It says the cases say it is fact-

1    dependent.

2              MR. SILVERMAN:  Right.

3                   The *American Airlines* decision is the decision

4    that I think basically distills the analysis on

12:38   5    substantially connected or substantially related.

6                   What *American Airlines* says is that, if they

7    are substantially related, that's almost the end of the

8    story.  You know, according to *American Airlines*, it creates

9    an irrebuttable presumption that there is an actual conflict

12:39   10   of interest.

11                  And, so, I was trying very hard to reconcile

12   this with the *Burns* decision, and what I -- I may be wrong,

13   but what I have come up with is that the *American Airlines*

14   analysis is not really the analysis for criminal cases.  I

12:39   15   think that, in light of the *Gonzalez-Lopez* decision, which

16   reaffirms the right to the lawyer of choice, and then the

17   *Kyler* decision that's cited within *Burns*, I was of the

18   impression that, because we're dealing with the Sixth

19   Amendment in criminal cases, the analysis is actually -- the

12:39   20   analysis in the *Burns* case is the correct analysis.  And, of

21   course, the *Burns* case is decided about twelve years after

22   Judge Atlas issued her thoughtful opinion.

23                  THE COURT:  Have you looked at *United States v.*

24   *Lucio?*

12:40   25                  MR. SILVERMAN:  No.

1          THE COURT:  It's an April 13, 2013, decision by

2    Judge Hanen.

3          MR. SILVERMAN:  Can you give me the cite?

4          THE COURT:  I can give you the Westlaw cite.  It is

12:40   5    2013 Westlaw 1701065.

6               It does deal with a criminal case.  The facts

7    are different.  In that case there was a clear indication on

8    the part of the defendant's counsel to circumscribe

9    cross-examination of a witness who had been a prior client

12:40   10   of the lawyer.

11         MR. SILVERMAN:  What was the outcome of that, Your

12   Honor?

13         THE COURT:  Disqualification for both actual and

14   potential conflict.

12:40   15        MR. SILVERMAN:  All right.

16         THE COURT:  Very lengthy discussion of the

17   applicable standards, disciplinary rules, model rules and

18   common-law.

19         MR. SILVERMAN:  All right.  I did not read that

12:41   20   one, but I would like the opportunity to read that one and

21   analyze it --

22         THE COURT:  I am inclined to think that we ought to

23   do this.  Why don't we recess for 45 minutes -- or we can

24   make it an hour so you can grab something to eat as well,

12:41   25   have you all look at this case -- it may or may not be

```
 1    helpful -- it certainly is thorough -- in a criminal case

 2    and very recent -- and then to bring to my attention after

 3    the recess any additional arguments you want to make.

 4              MR. SILVERMAN:  Yes, Your Honor.

 5              MR. JOHNSON:  Yes, Your Honor.

 6              MR. DOYLE:  Your Honor, could you rule on my

 7    motion?

 8              THE COURT:  Your motion to withdraw?

 9              MR. DOYLE:  Yes, Your Honor.

10              THE COURT:  When we come back.

11              MR. DOYLE:  Okay.

12              THE COURT:  All right?  I take it nobody will say

13    anything with respect to that motion.

14              MS. CRISWELL:  We have no objection.

15              MR. JOHNSON:  No objection.

16              THE COURT:  All right.  Never mind.  I will grant

17    it.

18              MR. DOYLE:  Thank you, Your Honor.

19              THE COURT:  All right.  You don't have to come

20    back.

21                   All right.  One hour.  Thank you.

22              MR. PEARSON:  Thank you, Judge.

23                        (Lunch recess)

24              THE COURT:  Did y'all have a chance to read the

25    cases?
```

12:41    5
12:42   10
12:42   15
12:42   20
13:59   25

1          MR. JOHNSON:  Yes, Your Honor.

2          MR. SILVERMAN:  Yes, Your Honor.

3          THE COURT:  All right.  Is there anything you want

4   to add on that before I turn it back to the government?

13:59   5          MR. SILVERMAN:  Yes.

6          THE COURT:  Go ahead.

7          MR. SILVERMAN:  So --

8          THE COURT:  By the way, in the civil cases:  We

9   have run into a real need for an extended hearing in a

13:59   10   criminal case.

11                   (Off the record)

12          MR. SILVERMAN:  Back on the record.  Norm Silverman

13   for Mr. Fisch.

14              This case is an excellent illustration of what

13:59   15   appears to be a genuinely unwaivable conflict of interest

16   both because of the subject matter of the conflict, the

17   nature of the two conflicts that it presents, and the

18   unwillingness of the defendant to pick a horse and ride it.

19   As the judge said in this opinion, this defendant was trying

14:00   20   to have his cake and eat it, too.  This defendant was trying

21   to turn the threat of a conflict of interest into a sword

22   and use it to his tactical advantage.

23              This judge that wrote this opinion is

24   exactly -- is a patient individual that took all measures

14:00   25   not to interfere with Lucio's right to a lawyer of his

1    choice.

2                 The facts are convoluted, but at the end of

3    the day, Blalock is a lawyer representing Lucio, a thug that

4    was -- or an alleged thug that was attempting to, according

14:01    5    to this indictment, intimidate Judge Limas into not

6    discussing the fact of an escape, even though it was on a

7    court record, and Judge Limas had supposedly, in exchange

8    for campaign funds, agreed to remain silent about the facts

9    of the escape.

14:01    10                It's a strange convoluted fact pattern.

11    Blalock is intercepted on, I guess, a T3 or some sort of a

12    wire intercept having a discussion with Judge Limas where --

13    and in the discussion, where Blalock is also a campaign

14    person for the judge, Blalock brings up the fact that,

14:01    15    'People that would give money to your campaign are concerned

16    about the fact that this escape occurred while you were on

17    the bench.  Why don't you just release the transcript?'  And

18    the judge replies, "I can't."

19                 So, that statement "I can't" and what it means

14:02    20    to the litigation as a whole is, obviously, a central issue

21    in the trial of Lucio.  The government, I think, wants to

22    draw the implication in that case that the reason Judge

23    Limas can't release the transcript is because there's some

24    sort of a secret agreement not to talk about it.

14:02    25                I image the witness -- looking at Blalock as a

1   witness, Blalock could lend context one way or the other to

2   what the statement means.  That's all I can adduce from the

3   facts of this case.

4            That is a completely -- not just a different

14:02  5   planet.  It is a different universe light years away from

6   what's going on in the case of United States v. Fisch.

7            In Fisch, the allegation, as I understand it,

8   is that a person, Lloyd Williams, represented himself to

9   have entrée to high-ranking officials, a lawyer in the

14:03  10   Department of Justice named "Ron McNeil" that was the lead

11   drug prosecuting lawyer in the United States, an FBI agent

12   named "Dick Miller", someone else named "McGauley" and

13   someone named "King" in Medicare.  Williams represented that

14   he had been a longtime operative serving various enforcement

14:03  15   branches of the Department of Justice and, as a result of

16   his service to his country, he had unique ability to cause

17   the Department of Justice to give sentencing consideration

18   to defendants that supplied information helpful to the

19   government.

14:04  20            There are, I believe, five witnesses, slash,

21   convicted defendants in this case that all claim that

22   representations about Lloyd Williams' ability to affect

23   their sentences were made to them.  The lawyer, not

24   necessarily an attorney of record -- but the government

14:04  25   alleges that in all of those instances Fisch was a lawyer

1    that talked to or in some way was involved with these

2    various defendants.  The government alleges in its

3    indictment that a Defendant Herrera was one of the subjects,

4    a Defendant Imo was another and the Defendant Portillo was

14:04    5    another.

6            The Defendant Portillo would testify that he

7    caused monies to be paid to Williams through Fisch through

8    Fisch's trust account and that, rather than receive

9    consideration and a reduced sentence from Ron McNeil or some

14:05   10   other high-ranking Justice Department official, he arrived

11   one morning to find himself and his wife in trial before

12   Judge Lynn Hughes.

13           Portillo has pled guilty to a major narcotics

14   trafficking conspiracy, apparently.  The fact that Portillo

14:05   15   is a convicted drug felon is no secret.  It's part of the

16   case.

17           Portillo claims a conflict arising out of

18   Silverman's representation of Portillo eight years ago on a

19   criminal forfeiture which the government contends is

14:06   20   relevant to the prosecution of Portillo.  Well, the

21   prosecution of Portillo has been completed.  He hasn't been

22   sentenced yet but has already pled guilty.

23           I am imagining that the hundred thousand

24   dollars taken from the Mendozas in the bus station was the

14:06   25   least of Mr. Portillo's problems in that indictment.  My

1    basis for saying that is nothing I learned from

2    Mr. Portillo, certainly, as I had disclosed to the Court,

3    once when I represented other people, not knowing anything

4    about Mr. Portillo -- I am aware of the facts of those other

14:06    5    people's cases, and when those people or people related to

6    them -- when their names appeared in Mr. Portillo's

7    indictment, I immediately did not represent Mr. Portillo

8    because that was a conflict.

9            Now, in the case against Fisch, to assert

14:07    10    that -- Oh. And, so, Mr. Portillo -- As we now stand, the

11    theory of the conflict is Silverman will somehow refrain

12    from vigorously cross-examining Portillo, and the precise

13    issue in the painstaking review, as it's put, that we're

14    supposed to be making now -- the precise nature of the

14:07    15    conflict is Portillo lied to Silverman about the lawfulness

16    of the money. The basis for that is that Portillo agreed to

17    the forfeiture of the money at the time he agreed to plead

18    guilty. The government is asking the Court to connect the

19    dots and to say, well, if he pled guilty or if he agreed to

14:08    20    forego his claim to the forfeiture, that must mean the money

21    was illegal in the first instance.

22            That does not necessarily follow. The

23    prosecution is free to demand a defendant agree with or

24    agree not to contest any part of the case when that person

14:08    25    decides to plead guilty. You can forego claims that might

1   independently be legal and valid but, as part of a plea

2   agreement for a greater good, one agrees to forego making

3   those claims.  This is not all -- It's not about the

4   truthfulness or falsity of it.  It's just a decision that

14:08   5   was made in the course of this person's case.

6           The basis of the conflict is supposedly that

7   Silverman would forego cross-examining Portillo about what

8   the government now wants to infer were false claims that the

9   money was innocently derived and had, as its reason for

14:09   10   being in the form of U.S. currency on two people in a bus

11   station, a legitimate purpose.

12           That is so many orders of magnitude removed

13   from the controversy and the questions raised by Fisch's

14   relationship with Williams that it is an infinitesimally

14:09   15   small part of a very large case involving many, many people.

16   This is not the type of thing that is substantial or

17   substantially related in any way to the allegations for

18   which Fisch is on trial.

19           You know, the issues in Fisch's case are was

14:10   20   Lloyd Williams actually capable of delivering what he

21   promised?  Did Fisch in some way solicit a bribe?  Did Lloyd

22   Williams discuss with Fisch that this was a bribery scheme?

23   Or did Fisch -- Was Lloyd Williams actually going to deliver

24   the results is one question.  The next question is did Fisch

14:10   25   reasonably believe that Williams was going to make entrée

1    into the highest echelons of the Justice Department in order

2    to get consideration for these defendants.  And the next

3    part of it is was the -- were the defendants ever informed

4    that, rather than paying Lloyd Williams for this

5    introduction, Lloyd Williams not being a law officer, that

6    in fact the money was being used to bribe people; and if the

7    defendants believed that, was that as a result of something

8    Fisch said or did.  I mean, that's what this case is about.

9            This "conflict" is just simply not one.  It's

10   not a conflict.  And when you see what a real conflict looks

11   like and the way that the conflict is manipulated by the

12   Lucio defense time to try to preserve error and at the same

13   time assert their Sixth Amendment right -- I mean, that's

14   gamesmanship and that's not what we're about here.

15           I am trying to defend Abraham Fisch.  Fisch is

16   completely and fully willing to waive any conflict.  I won't

17   refrain from cross-examining about relevant matters.  I

18   won't cheat Fisch out of what the Sixth Amendment guarantees

19   him.  That is not --

20           These two cases are completely and

21   diametrically opposed.  The issues are -- there's just no --

22   I can't say no commonality, but it is so tangential as to

23   not be worth all the effort we're expending on it, I think.

24           I guess that's a good place to stop.  Right?

25   Okay.

1          THE COURT:  All right.  Thank you.

2               Mr. Johnson or --

3          MR. JOHNSON:  Mr. Pearson.

4          THE COURT:  Mr. Pearson.

14:12   5          MR. PEARSON:  Thank you, Judge.  I drew the short

6    straw; so, I am happy to talk about these.

7          THE COURT:  Not just the cases but also respond to

8    the points that have --

9          MR. PEARSON:  Absolutely.

14:13  10          I'll start where defense counsel left off,

11   which was his statement that he's not going to refrain in

12   his cross-examination of Mr. Portillo, and I think that puts

13   a fine point on the conflict of interest that is here.

14          The facts of *Lucio* are different in that the

14:13  15   conflict was created by the presence of the lawyer in that

16   case on the recorded telephone call.  So, the particular

17   issue was the witness advocate rule.  But the law that is

18   laid out there is, I think, really helpful because that

19   shows how the courts engage in the kind of analysis when you

14:13  20   have got either an actual or a potential conflict and then

21   what to do in those circumstances.

22          The discussion of the law centers on another

23   case which actually is very similar to this case and that's

24   *Infante*.  And *Infante* involved, basically, this situation

14:14  25   where the defense attorney representing a client had

1    previously represented two of the cooperating witnesses who

2    testified against that client -- I think it was a narcotics

3    trial -- and the defense attorney did not cross-examine

4    those witnesses as vigorously as he could, and the Fifth

14:14   5    Circuit reversed the conviction for an inquiry into whether

6    or not there was prejudice from the conflict of interest.

7            And the portion of *Infante* that sort of

8    highlights this issue is quoted in *Lucio* where it says

9    "Foster" -- once his former clients took the stand to

14:14   10   testify against Infante, "Foster was put in a position

11   conducive to divided loyalties," and that's the particular

12   phrase that the Fifth Circuit keeps coming back to.  "There

13   is a conflict of interest when the defense attorney is put

14   in the position that's conducive to divided loyalties,"

14:15   15   because he had to choice between vigorously cross-examining

16   his former clients, which might jeopardize their chances of

17   the government filing a Rule 35 motion on their behalf, and

18   not vigorously cross-examining them, which would risk

19   allowing the government to establish through their testimony

14:15   20   an essential element of the case against Infante.

21           And if you apply that principle to this

22   situation -- It's very likely that Mr. Portillo is going to

23   take the stand in the case against Defendant Fisch.  There's

24   no guarantees, but we expect that Mr. Portillo is going to

14:15   25   say that Mr. Fisch, along with Mr. Williams, told him that

the over one million dollars Portillo was paying was in part
going to be used to pay public officials.

And if Defendant Fisch wishes to contest that
assertion, his counsel, Mr. Silverman, is going to be in the
position of putting on an effective and vigorous
cross-examination of Mr. Portillo.  And, so, he's going to
be put in, it seems to me to be, that same position that the
attorney in *Infante* was in factually and, from a legal
standpoint, the position that Mr. Lucio's counsel was in in
the *Lucio* case, and that is in that position conducive to
divided loyalties.

I am happy to go into a little bit more of the
details, but that's sort of the issues that we have
particularly identified that is our concern.

In *Infante* -- and this is for the Court's
edification -- the factual difference was there the
defendant in that case -- they didn't go through a *Garcia*
hearing; so, there wasn't clarity on the issue of whether or
not the defendant was intending to waive conflict-free
representation.  So, it got sent back for that.

So, our concern is both the cross of
Mr. Portillo and respecting the obligations Mr. Silverman
has to Portillo but, also, with respect to Defendant Fisch,
the conflict but, also, the right to effective counsel.

The concern that we would have is, if

1    Mr. Fisch is going to say, 'I am going to waive any

2    conflict-free representation from Mr. Silverman,' that

3    whether he's also in some sense waiving his right to

4    effective assistance if the cross is somehow cabined in a

14:17    5    way that wouldn't impact Portillo's own -- or the

6    obligations from Mr. Silverman to Mr. Portillo.

7               Thank you.

8          MR. SILVERMAN:  Make I just have just a second to

9    respond?

14:18    10          THE COURT:  You may.

11          MR. SILVERMAN:   Thank you.

12               If the government means to suggest that there

13    was a reference made to Portillo's possible Rule 35 --

14          THE COURT:  Well, I think here -- I mean, he hasn't

14:18    15    been sentenced yet.

16          MR. SILVERMAN:  Right.  Or a Rule 5K1 or they call

17    it the 35, but I know what they mean; a downward departure

18    motion in whatever form.

19               If the government is trying to suggest that

14:18    20    Portillo might admit something on the stand while he's a

21    sworn witness in response to my cross that would then harm

22    Mr. Portillo's ability to receive that consideration, that's

23    just ludicrous.  This witness is sworn to tell the truth.

24    It doesn't matter whether it's me, Dan Cogdell, Mike Hinton

14:19    25    asking -- it doesn't matter who is asking the questions.

1    Portillo has to tell the truth.

2              And for the government to say, 'Well, you told

3    the truth, but it didn't suit us' -- well, that's just not a

4    proper use of the downward departure motion.

14:19    5         THE COURT:  I'm not sure that that's the

6    government's argument.

7         MR. SILVERMAN:  Okay.  Well, I am just making sure

8    because I got that inference from it, and maybe I'm --

9         THE COURT:  That's certainly not the analysis used

14:19   10   in *Infante* or in the *Lucio* case that cites it in the

11   analysis.

12        MR. SILVERMAN:  Okay.  In that case --

13        THE COURT:  It's the problem presented by the fact

14   that you have got a former client who is testifying in a way

14:19   15   that will hurt a present client and the divided loyalties,

16   the conflict of interest that that creates.

17        MR. SILVERMAN:  Your Honor, just from my

18   representation --

19        THE COURT:  You can't hurt one without hurting the

14:20   20   other.  You can't advance one without hurting the other.

21        MR. SILVERMAN:  Mr. Portillo -- And with all

22   respect to everyone involved in this, whatever hurt has been

23   done to Mr. Portillo -- He has pled.

24        THE COURT:  That doesn't -- That's not the point.

14:20   25   His sentencing is outstanding.

1          MR. SILVERMAN:  Right.

2          THE COURT:  He hopes to have a lower sentence --

3          MR. SILVERMAN:  Yes.

4          THE COURT:  -- by testifying truthfully, yes, but

14:20   5    to the extent your cross-examination is meant to undercut

6    the force of his testimony and lower -- it is contrary to

7    his interests by promoting Mr. Fisch's interests.  If you

8    are respectful of Mr. Portillo's interests, the problem is

9    that that may then limit your effective representation of

14:20  10   Mr. Fisch.

11          So, the problem is that their interests are

12   divergent, and to the extent -- and this is a question --

13   you still owe duties of loyalty as well as duties of

14   confidentiality to Mr. Portillo, that's the either actual or

14:21  15   potential conflict.  That's what we're talking about.

16   That's what I understood *Lucio* and *Infante* to talk about.

17          MR. SILVERMAN:  I had asked the Court, when I moved

18   for a continuance, to provide me access to the actual

19   criminal file on Portillo and on the other witnesses so that

14:21  20   I would know all the discrete acts the government contended

21   they had performed in their various cases.  I am imagining

22   that that file would contain much more than a hundred-

23   thousand-dollar-in-cash seizure not made for Mr. Portillo.

24          THE COURT:  I don't think that's the point either.

14:21  25   That bears on -- That is a way -- Your point about the

1    hundred thousand dollars in relation to what Mr. Portillo

2    pleaded guilty to, that's a way of describing your view of

3    the lack of substantial relationship between your

4    involvement in representing Mr. Portillo and the current

14:22  5    case involving Mr. Fisch, but I don't think that it bears on

6    the conflict issue otherwise.

7         MR. SILVERMAN:  Okay.  The subject matter of the

8    statements or documents provided on Portillo's behalf

9    tending to show the money is innocent -- I think the Court

14:23  10    can agree with me that the relevance on that precise issue,

11    to the notion that this is contrary to Portillo's interests,

12    is that -- The government draws the inference the statements

13    made, the evidence presented, were not truthful.  Okay?

14    That means it's impeaching.  I turn that over to a

14:23  15    government lawyer --

16         THE COURT:  You turned over the confidential

17    communications your client made to you during your

18    representation of him?

19         MR. SILVERMAN:  Yes, because I believed them to be

14:23  20    true and exculpatory on the money.  I turned them over to

21    Miss Kempner when I was trying to resolve Mr. Portillo's

22    forfeiture.

23         THE COURT:  Statements that Mr. Portillo made you

24    turned over?

14:24  25         MR. SILVERMAN:  There are no statements beyond what

1    the documents represent.  That's it.  Mr. Portillo said, 'I

2    am a famous musician.  I was buying a tour bus.  That's what

3    this money was for.  Here's how I earned it.  Here's the

4    receipts from where different bands played at my nightclub

14:24    5    and here's receipts' --

6            THE COURT:  Your argument has now shifted to:  I

7    don't have any confidential communications.

8            MR. SILVERMAN:  No.  I have what I have tendered to

9    the Court.  There was no discussion of Mr. Portillo being a

14:24    10   drug dealer.  There was a discussion of how terrible it was

11   that, just because this was in currency instead of some form

12   of check, that the government had seized it.

13            I turned over all the evidence to the

14   government.  Any lawyer is going to have the same

14:24    15   information that was provided on Portillo's behalf that I

16   turned over to Miss Kempner years ago.  It's *Brady*.

17            If they're now claiming that that's drug

18   money, then the fact that Portillo said otherwise and

19   Portillo is a witness against Fisch, it's *Brady*.  It's

14:25    20   impeachment.

21            So, there is no reason to remove me, as any

22   other lawyer would have the same motivations.

23            THE COURT:  Let me hear the government's response

24   to just that argument and then anything else you want to add

14:25    25   you may.

 1          MR. SILVERMAN:  Yes, Your Honor.

 2          THE COURT:  So, the argument now, as I understand

 3  it, is Mr. Silverman didn't learn anything that he hasn't

 4  turned over to the government and, therefore, it has lost

14:25  5  whatever confidentiality it has.  I think that's the

 6  argument.

 7          MR. PEARSON:  And, so, there's no longer -- I think

 8  the problem is that, to sign on to that, you would have to

 9  sign on to the idea that it's just a question of whether or

14:26  10  not there has been any confidential communications.

 11          THE COURT:  Well, that is a factor.

 12          MR. PEARSON:  Sure.  Absolutely.  I think the

 13  broader question is whether or not defense counsel can do

 14  both jobs, can be in a position to provide effective

14:26  15  representation of the defendant and also maintaining his --

 16  If he's saying there is no longer any confidential

 17  communications, then maybe the duty of confidentiality isn't

 18  there anymore, but I think defense counsel also just -- I

 19  mean, he just told the Court what his client came in and

14:26  20  said to him.  And, so, even crossing Mr. Portillo about

 21  simple things like 'Are you a drug dealer?' -- I mean, he

 22  presumably discussed that topic with Mr. Portillo.

 23          So, I'm not trying to -- but accepting that

 24  premise of there's no confidential communications, that

14:27  25  doesn't seem to fit with the facts that we know of.

1        THE COURT:  Anything else, Mr. Silverman?

2        MR. SILVERMAN:  No.  I'm not going to beat a -- go

3   over ground we have already covered.

4        THE COURT:  All right.

14:27    5        MS. MUSICK:  May I add something on behalf of my

6   client just very briefly --

7        THE COURT:  Sure.

8        MS. MUSICK:  -- on behalf of Mr. Portillo?

9            These were some notes that I actually made

14:27   10   earlier before we broke for lunch when Mr. Silverman was

11   discussing his position.

12            Basically, as I understood his position -- and

13   it's changed just a little bit here this afternoon -- is he

14   gathered a lot of his information from representatives of

14:27   15   Mr. Portillo and from other sources who provided

16   information.  Mr. Portillo's position is that's all part of

17   the attorney-client relationship.  So, the duty is not only

18   to not disclose your confidential communications with your

19   client but the duty not to disclose those matters which you

14:28   20   learn about through representation of your client.  So, we

21   believe it's a broader issue than just confidential

22   communications.

23            I have written down -- and it was not as

24   articulate as the *Infante* and *Lucio* cases.  I had written

14:28   25   down, you know, "continued duty to not harm his client."

1          More artfully said, as the Court just said,

2     there is that divided loyalty.  And, so, I just wanted to

3     sort of reiterate that on behalf of Mr. Portillo.  He

4     believes there is continued duty not to cause him harm going

14:28  5     forward even though he is now a former client.

6          MR. SILVERMAN:  I told you I would shut up and I

7     really want to, but....

8          Portillo turned over the documents or Portillo

9     caused the documents to be turned over to Silverman with

14:28  10    full knowledge that those documents would be presented to

11    the government in an effort to get the money back.  And, so,

12    whatever happened then, that was waived, and it didn't get

13    unwaived now just because Portillo got indicted, because I

14    have already done what I was supposed to do and turned the

14:29  15    documents over to the government.

16          And, so, this just seems to me to -- There is

17    no conflict arising out of that representation.

18          THE COURT:  I think that the order in which I need

19    to address the issues is as follows.  I have to first

14:29  20    determine an actual conflict, whether there is one.  If

21    there is one, I have to hold a *Garcia* hearing, which is

22    basically to ensure that Mr. Fisch, in fact, does what

23    Mr. Silverman and Mr. Fisch have already informed me he

24    does, which is to waive any conflict.  And even if I find

14:30  25    that there is a knowing and intelligent waiver of what I

1   find to be an actual conflict, then I have to determine

2   whether I should, nonetheless, exercise my discretion and

3   authority to disqualify Mr. Silverman because of an either

4   actual conflict that I don't think can appropriately or

14:30  5   should be waived or because of a potential conflict that I

6   do not believe should be waived.

7          And that would then open the question of, if

8   Mr. Silverman is indeed disqualified from continuing to

9   represent Mr. Fisch, although Mr. Silverman has done so

14:30  10   formerly for a very brief period, the implications for the

11   schedule that we have now.

12          So, let me address these issues as best I can.

13   They have come up -- ironically, in a case that is as old as

14   this case, they have come up in a compressed and

14:31  15   eve-of-trial fashion that requires an efficient but thorough

16   review.

17          The cases that the parties have pulled

18   together and that we have been able to find I think lay out

19   the applicable law, and I don't think there is any dispute

14:31  20   as to the legal standards that govern the analysis.

21          There is also no dispute that these cases are

22   difficult for, I think, two reasons.  One is that, as a

23   number of the thoughtful opinions that have been brought to

24   my attention make clear, what we're trying to do here is

14:32  25   balance two aspects of a constitutional right.  One is the

1    right to be represented by counsel of one's choice.  That

2    has been a theme throughout this case in different ways.

3    And the second is the right to be represented not only by

4    counsel one chooses but, also, by counsel whose

14:32    5    representation will be effective, will be conflict-free.

6              These are described in the cases as

7    corresponding rights.  They both are surrounded in the Sixth

8    Amendment, but both have to be honored.  And the court's

9    obligation is not only to ensure that counsel of choice is

14:33   10    respected but, also, that the limits on that right are

11    respected.  Those limits are the independent duty to ensure

12    that criminal defendants have a trial consistent with the

13    Sixth Amendment, which requires an effective advocate as

14    opposed merely to a chosen advocate; and, if those are

14:33   15    inconsistent, then the chosen advocate has to cover.

16              The court's obligation, also, in part, rests

17    on the integrity of the system, which is an abstract but

18    important concept.  Fleshing it out in the details required

19    by this posture is the challenge.

14:34   20              So, we have those competing judicial duties,

21    we have these competing interests, and we recognize that

22    there is a presumption, in the balance, in favor of counsel

23    of one's choosing, a presumption that may be overcome by an

24    actual conflict of interest or a showing of a serious

14:34   25    potential for conflict.

1              So, the first question is the question of

2    whether there is an actual conflict of interest present.

3    And here the cases recognize that not only is the analysis

4    complicated and difficult because of the tension between

14:35  5    right to counsel of choice and the need to ensure effective

6    conflict-free counsel but because each of these cases is

7    heavily fact-dependent.  Heavily.  Extrapolating from one to

8    the other is difficult.  And to say that this case presents

9    unusual facts is certainly an understatement, but each of

14:35  10   the cases that gives rise to these eve-of-trial conflict

11   situations also seems unusual.

12             So, the Fifth Circuit has found some basis for

13   extrapolation and generalization.  The criteria for

14   identifying whether there is an actual conflict have been

14:35  15   laid out by the cases:  whether there is confidential

16   information helpful to one client but harmful to another,

17   whether and how closely the subject matter of the multiple

18   representations is related, whether the prior representation

19   is unambiguously terminated.

14:36  20             Quoting the *Infante* case, which was cited

21   again in the *Lucio* case as well as the more recent *Hernandez*

22   case, 690 F.3d 613 --

23             MR. SILVERMAN:  Could you say that cite again.

24   690 --

14:36  25             THE COURT:  -- 613.

1          MR. SILVERMAN:  Thank you.

2          THE COURT:  *United States v. Hernandez*.

3              All of these talk about a division in counsel

4     loyalties when there are divergent or competing interests

14:36   5     between a former client and a current client.  And, clearly,

6     we have that here.  We have divergent interests between a

7     former client and a current client.  Undeniable.  We have a

8     current client who does not want to be convicted.  We have a

9     former client who is going to testify against the current

14:37   10    client in the hope of the opportunity for a lower sentence

11    on his criminal case.

12             The first question:  Does Mr. Silverman have

13    confidential information helpful to one client but harmful

14    to another?  Second and a related question:  How closely the

14:37   15    subject matter of the multiple representations is, what's

16    the substantial overlap here between the forfeiture

17    proceeding and the current -- and the criminal case against

18    Mr. Portillo and, therefore, this case.

19             I think it's most helpful to look at the

14:37   20    second question first.

21             On the second question, although Mr. Silverman

22    has worked hard to minimize the relationship between the

23    forfeiture proceeding and the later criminal case that was

24    the basis of the testimony that will be offered against

14:38   25    Mr. Fisch, at the end of the day I don't think Mr. Fisch and

1    Mr. Silverman succeeded.

2              The forfeiture case arose out of the same

3    facts, same events, same activities, that became the basis

4    for the criminal indictment.  And when Mr. Portillo, through

14:38    5    yet another former counsel, made a claim to those proceeds

6    and Mr. Silverman represented him in pursuing that claim, as

7    Mr. Silverman acknowledged, I believe, the subject was where

8    did the money come from, and that was the basis of the

9    criminal indictment, where did this and other money come

14:39   10    from.  Was it proceeds?  Was it something else?  Paying

11    people to ferry money around.  Obviously, closely related to

12    the set of issues that became the basis of the criminal

13    indictment.

14              And the government's point that the evidence

14:39   15    of the seizure that was the forfeitures -- the role of that

16    evidence in the criminal trial against Mr. Portillo, I

17    think, makes the point crisper.  Does Mr. Silverman have

18    confidential information from Mr. Portillo?

19              Mr. Silverman, again, said, 'Well, I only met

14:40   20    with him once on the forfeiture and then it went dormant.

21    And then I only met with him on the indictment once and then

22    I got conflicted-out.  And I set him up with Mr. Schneider

23    and was gone.  And anything that I learned from Mr. Portillo

24    I gave to the government because it was all helpful to

14:40   25    Mr. Portillo.'

1          Obviously, we're measuring information that's

2   hard to -- we're testing descriptions that are hard to test.

3          We have Mr. Silverman saying, 'I only learned

4   stuff that was helpful and I cheerfully and with the consent

14:41   5   of my client disclosed it all.  I got no confidential

6   information that hasn't already been divulged.'  That asks

7   me to assume that this was a pretty one-dimensional set of

8   exchanges.

9          I have no way to know -- and neither do you,

14:42   10   Mr. Silverman -- if, in the examination of Mr. Portillo,

11   information that Mr. Portillo or his representatives

12   authorized to speak as his agents for the purpose of

13   obtaining legal advice -- I have no basis to know if, in the

14   examination or if right now, there is other information that

14:42   15   reveals Mr. Portillo's lack of truthfulness, his failure to

16   recall accurately, his willingness to make statements that

17   are incomplete truths or that are misrepresentation by

18   virtue of omissions.  There is simply no way to compare

19   what, in fact, he told you, others acting on his behalf told

14:43   20   you, and what was then memorialized and what was sent to the

21   U.S. Attorney's Office or placed on the record in a plea

22   colloquy.

23          What we do know is that Mr. Portillo is going

24   to be testifying about his criminal case that grew out of

14:43   25   the proceeding that you represented him in, and it will be

1    important to Mr. Fisch to have Mr. Portillo's truthfulness

2    undermined.  We do know that.  That is a choice between

3    vigorously cross-examining Mr. Portillo on the truthfulness

4    and completeness of his testimony or muting that

14:44   5    examination, avoiding any area that would undermine

6    Mr. Portillo's truthfulness, credibility, in order to act in

7    a fashion consistent with his desire to obtain a more

8    favorable sentencing outcome.

9            *Infante* cited in *Lucio* sums it up crisply.

14:45   10    Once his former clients took the stand to testify against

11    *Infante,* Foster, the lawyer, was put in a position conducive

12    to divided loyalties.  He had to choose between vigorously

13    cross-examining his former clients, which might jeopardize

14    their chances of the government filing a Rule 35 motion on

14:45   15    their behalf, and not vigorously cross-examining them, which

16    would risk allowing the government to establish, through

17    their testimony, an essential element of the case against

18    Infante.  Thus, Foster, the lawyer, labored under a conflict

19    of interest."

14:46   20            That is, structurally, what we have here.  And

21    unless I can find an absence of confidential information

22    helpful to one client but harmful to another, we have not

23    only a breach of the duty of confidentiality.  We also have

24    a conflicting loyalty, and there are continued duties of

14:46   25    loyalty to Mr. Portillo owed even though there are -- in

1    part owed because this is not a case in which the subject

2    matters are so isolated or distant from each other that the

3    duty is simply not implicated.

4              The prior representation has unambiguously

14:47  5    been terminated; so, that does weigh in favor of finding no

6    actual conflict.  But the relationship does not weigh in

7    favor of finding no actual conflict.

8              The opportunity for getting confidential

9    information was clearly present, clearly present, over a

14:47  10   period that may have been relatively short, given the long

11   period of dormancy of the case but reawakened when the

12   criminal indictment came down, and there was another meeting

13   that you have described with your client as well -- that is,

14   prior to the indictment being issued when he was arrested on

14:48  15   a complaint.

16             So, on this record, I think it is very

17   difficult not to find an actual conflict and it's even more

18   difficult not to find a potential conflict.

19             The potential conflict is even more pressing

14:48  20   because of the likelihood that none of us can predict with

21   any confidence whether or when -- In the course of the

22   presentation of Mr. Portillo's testimony or Mr. Portillo's

23   answers on cross-examination, the usefulness of information

24   that he divulged during your representation of him,

14:49  25   Mr. Silverman, may become vivid, may become pressing, and at

1    that point we would be in the middle of the

2    cross-examination.  The potential for that to occur, I

3    think, is inescapable and is a serious problem.

4                But, having found an actual conflict, I think

14:49  5    my next step is to have the *Garcia* hearing.  So, I need to

6    have Mr. Fisch answer questions relating to his waiver.

7                Mr. Fisch, raise your right hand, please.

8                DEFENDANT FISCH:  Can I come up?

9                THE COURT:  You may.

14:49  10               Do you solemnly swear that the testimony you

11   will give before this court will be the truth, the whole

12   truth and nothing but the truth, so help you, God?  Or you

13   may affirm.

14               DEFENDANT FISCH:  I affirm.

14:50  15               THE COURT:  Go ahead and take the stand.

16               I am going to ask questions and then both

17   sides may follow up.

18               MR. SILVERMAN:  Yes, Your Honor.

19               THE COURT:  Basic questions.

14:50  20               Mr. Fisch, would you tell me your name,

21   background, very briefly.

22               DEFENDANT FISCH:  Abraham Fisch.  Background?

23               THE COURT:  You're how old now?

24               DEFENDANT FISCH:  55 now.

14:50  25               THE COURT:  Do you have a JD --

1          DEFENDANT FISCH:  Yes, Your Honor, I do.

2          THE COURT:  -- as well as an undergraduate degree?

3               All right.  How long did you practice law?

4          DEFENDANT FISCH:  I am going -- I just started my

14:50   5   29th year.

6          THE COURT:  And, obviously --

7          MR. SILVERMAN:  I am just trying to hear him.

8          THE COURT:  That's fine.  You can move up if you

9   need to.

14:50  10              Obviously, this testimony is limited to the

11   purpose of this hearing.

12         DEFENDANT FISCH:  Should I just talk here?

13         THE COURT:  That's fine.

14         DEFENDANT FISCH:  All right.

14:50  15         THE COURT:  Now, Mr. Fisch, you're familiar with

16   the notice of the conflict in this case that the government

17   filed?

18         DEFENDANT FISCH:  Yes, ma'am.

19         THE COURT:  All right.  And, as I understand the

14:50  20   position that your lawyer has made clear on your behalf and

21   the -- and you yourself have made clear, in filing through

22   an affidavit just late last week -- is it your position that

23   you are waiving any possible -- any conflict of interest

24   that Mr. Silverman may have because he previously

14:51  25   represented Mr. Portillo, who is going to be a witness

1   against you in this case?

2           DEFENDANT FISCH:  Yes, Your Honor.

3           THE COURT:  I need to ask the standard questions.

4               Are you currently under the influence of any

14:51   5   drugs or any alcoholic beverages?

6           DEFENDANT FISCH:  No, Your Honor.

7           THE COURT:  Are you addicted to any drugs or any

8   alcoholic beverage?

9           DEFENDANT FISCH:  No, Your Honor.

14:51  10           THE COURT:  Are you taking any medications?

11           DEFENDANT FISCH:  Yeah, I take some medications.

12   Yes.

13           THE COURT:  Do you take any medications that affect

14   your ability to see and understand what's going on around

14:51  15   you?

16           DEFENDANT FISCH:  No, ma'am.

17           THE COURT:  Have you had any recent changes in the

18   dosage or frequency of the medication?

19           DEFENDANT FISCH:  No, ma'am.

14:52  20           THE COURT:  Any side effects?

21           DEFENDANT FISCH:  No, ma'am.  No, Your Honor.

22           THE COURT:  Are you sick in any way?

23           DEFENDANT FISCH:  No, Your Honor.

24           THE COURT:  You understand and you heard me express

14:52  25   my concerns about the problem that your lawyer,

1    Mr. Silverman, may face if Mr. Portillo testifies and

2    Mr. Silverman has to cross-examine him?

3            DEFENDANT FISCH:  Yes, Your Honor.

4            THE COURT:  You understand that Mr. Silverman,

14:52   5    although he no longer represents Mr. Portillo, continues to

6    owe Mr. Portillo duties of respecting confidential

7    communications and privileged communications?

8            DEFENDANT FISCH:  We have discussed it, Your Honor.

9    Yes.

14:52  10            THE COURT:  You understand that?

11            DEFENDANT FISCH:  Yes, ma'am.

12            THE COURT:  And you understand that, even if

13    confidential information that Mr. Silverman has as a result

14    of representing Mr. Portillo would be useful to you,

14:53  15    Mr. Silverman could not use it in cross-examining

16    Mr. Portillo?

17            DEFENDANT FISCH:  I understand that, Your Honor.

18            THE COURT:  And do you understand that

19    Mr. Silverman also owes Mr. Portillo certain duties of

14:53  20    continued loyalty and cannot affirmatively act in ways that

21    may be harmful to Mr. Portillo --

22            DEFENDANT FISCH:  Yes, Your Honor.

23            THE COURT:  -- to his legal interests?

24            DEFENDANT FISCH:  Yes, Your Honor.

14:53  25            THE COURT:  And you understand that Mr. Portillo is

1    not testifying because his interests and your interests are

2    congruent?

3         DEFENDANT FISCH:  I know that.  Yes, ma'am.

4         THE COURT:  You understand that Mr. Portillo's

14:53  5    testimony is intended to lead to your conviction?

6         DEFENDANT FISCH:  Yes, Your Honor.

7         THE COURT:  And that the government believes that

8    Mr. Portillo has evidence that can establish the elements of

9    one or more of the counts against you?

14:53  10        DEFENDANT FISCH:  That's what they believe, Your

11   Honor.  Yes.

12        THE COURT:  All right.  And you understand that

13   cross-examination would, therefore, be directed towards

14   exposing him as someone who lies, who is not entitled to

14:54  15   credibility, who is simply doing this out of self-interest

16   and who should not be given any benefit from his testimony?

17        DEFENDANT FISCH:  I understand that, Your Honor.

18        THE COURT:  So, your interests and Mr. Portillo's

19   interests are deadly opposed.  Right?

14:54  20        DEFENDANT FISCH:  Yes, Your Honor.

21        THE COURT:  All right.  And, therefore,

22   Mr. Silverman has a choice.  You understand that?

23        DEFENDANT FISCH:  I do.

24        THE COURT:  All right.  And those kinds of

14:54  25   conflicts, those kinds of choices, can deny you your right

1    to effective assistance of counsel.  You understand that?

2              DEFENDANT FISCH:  Yes, Your Honor.

3              THE COURT:  You understand you're entitled to that?

4              DEFENDANT FISCH:  I do.

14:54   5              THE COURT:  Mr. Silverman might object or offer

6    evidence that would help -- he might object to evidence that

7    would hurt you but could help make the case that

8    Mr. Portillo is attempting to make, Mr. Silverman might

9    offer evidence that could help you but could hurt

14:55  10    Mr. Portillo, or he might be unable to do either of those

11    because of his duties of loyalty to Mr. Portillo.  Do you

12    understand that?

13              DEFENDANT FISCH:  And I'm not trying to be

14    disrespectful, Your Honor.  If you could put it in context,

14:56  15    because how you put it is a little --

16              THE COURT:  Sure.  There might be a document that

17    exposes Mr. Portillo to be a liar that Mr. Silverman might

18    have obtained through his representation of Mr. Portillo or

19    independently.  That choice of whether to offer that

14:56  20    document into evidence could implicate the same kind of

21    duties of loyalty, conflicting duties, that we talked about

22    earlier.  Do you understand that?

23              DEFENDANT FISCH:  Yes, Your Honor.  In that

24    context, yes.

14:56  25              THE COURT:  Again, potentially infringing effective

1    representation if Mr. Silverman is constrained from taking

2    positions on evidence that he otherwise would have taken?

3         DEFENDANT FISCH:  That would be contrary to my

4    Sixth Amendment rights, Your Honor.

14:57  5         THE COURT:  Yes.  You understand that?

6         DEFENDANT FISCH:  I do, Your Honor.  I do.

7         THE COURT:  And is it your desire, Mr. Silverman --

8    Mr. Fisch -- excuse me -- even in the face of all of these

9    risks, to, nonetheless, have Mr. Silverman continue to

14:57 10    represent you?

11         DEFENDANT FISCH:  I do, Your Honor.

12         THE COURT:  Mr. Silverman, according to the

13    position you have taken, is new to this case, relatively.

14         DEFENDANT FISCH:  Yes, Your Honor.

14:57 15         THE COURT:  And, yet, despite the fact that you did

16    not even decide, apparently, to have him appear on your

17    behalf until recently, you're, nonetheless, willing to

18    accept divided loyalty, conflicting interests, in the

19    representation that he provides?

14:57 20         DEFENDANT FISCH:  Yes, Your Honor.

21         THE COURT:  You understand why that seems a little

22    bit odd, that someone who you didn't even hire until very

23    recently -- at least for the purpose of a formal

24    appearance --

14:58 25         MR. SILVERMAN:  Judge, let me just clear that up,

1    if I may.  He didn't hire me until recently at all.  There's

2    no back story to this.  I truly was retained right when I

3    made my appearance.

4         THE COURT:  That's fine.  That makes my point even

14:58    5    stronger.

6         MR. SILVERMAN:  Yes.

7         THE COURT:  Mr. Silverman didn't even appear on the

8    scene, according to what he just said, until very recently

9    and, yet, you are that committed to having him and no other

14:58   10    lawyer represent you even if that other lawyer would be free

11    of any conflicts or any divided loyalties?

12         DEFENDANT FISCH:  Can I tell you why, Your Honor?

13    In my mind, Mr. Silverman is the hardest working attorney I

14    have ever been around.  He has spent 15, 16 hours a day

14:59   15    since he has become my attorney.  Nobody -- I trust him

16    fully with my life, Your Honor, because of his background

17    and his ability and his caring in this matter.

18         THE COURT:  Even though you just hired him

19    recently?

14:59   20         DEFENDANT FISCH:  Yes, Your Honor.

21         THE COURT:  You have, obviously, known him for

22    years.

23         DEFENDANT FISCH:  I have known Mr. Silverman for a

24    long time, Your Honor.  Yes, I have.  That's correct.

14:59   25         THE COURT:  Have you talked to any other lawyers

1   about whether it is advisable to have a lawyer representing

2   you who represented someone who is likely to be a very

3   important witness against you?

4          DEFENDANT FISCH:  I'm sorry, Your Honor.  I

14:59  5   didn't --

6          THE COURT:  You sought independent counsel on this

7   question?

8          DEFENDANT FISCH:  No, I have not, Your Honor.

9          THE COURT:  Obviously, you yourself are a lawyer.

15:00  10          DEFENDANT FISCH:  Yes, Your Honor.

11          THE COURT:  Is it your intent, knowing what you

12   know, after having thought about it at length --

13          DEFENDANT FISCH:  Yes, Your Honor.

14          THE COURT:  -- to waive your rights to a different

15:00  15   lawyer or to continue to represent yourself, as you did for

16   an extended period, in order to have Mr. Silverman represent

17   you despite the conflict of interest?

18          DEFENDANT FISCH:  Yes, Your Honor.

19          THE COURT:  Questions, Mr. Silverman?

15:00  20          MR. SILVERMAN:  I want to -- Your Honor, I want to

21   ask the Court a question, if I could, before I step in

22   something I don't want to.

23            May I globally ask this witness, who the

24   record already establishes served as Mr. Portillo's lawyer

15:01  25   on the very indictment that Mr. Portillo has pled guilty

1   to -- may I ask this witness if Mr. Portillo divulged to

2   this witness sensitive matters that then the lawyer Fisch

3   would be fully within his right to disclose to me as his

4   counsel without opening the door --

15:01  5        THE COURT:  I'm not going to rule on whether it

6   opens any doors or not, but you can ask whatever question

7   you think is appropriate to the proceeding.

8         I told some of the civil cases that were here

9   earlier that we're obviously in the middle of something

15:01  10  we've got to finish.

11         So, if you guys want to go get a cup of coffee

12   and come back in 15 minutes, you certainly may.

13       MR. SILVERMAN:  Well, as the Court is well aware,

14   in an analogous context, for example, in *United States*

15:02  15  *versus* --

16       THE COURT:  Wait.  I just said you could ask the

17   question.  Go ahead.

18       MR. SILVERMAN:  I know.  Let me just get my concern

19   out.

15:02  20       In *United States v. Simmons* the Supreme Court

21   said that an accused cannot be made to choose between his

22   Fourth Amendment right to establish standing and his Fifth

23   Amendment right to not incriminate himself.  And, so, what I

24   am asking you is -- Mr. Fisch's asserting his right to the

15:02  25  lawyer of choice, that's his Sixth Amendment right.  I want

1   to establish, through him, that many more confidential

2   communications were made to him than I would have even had

3   time to adduce from Mr. Portillo; and, so, any harm from

4   this is mooted by the fact that Fisch has the information at

15:02   5   his disposal and is within his right to share it with me.

6           May I ask him that without going into the

7   substance of the --

8           THE COURT:   Why don't you ask the question you want

9   to ask, and if the government believes it's appropriate for

15:03   10   them to object, at least I will have something concrete to

11   rule on.

12                   DIRECT EXAMINATION

13   By Mr. Silverman:

14   Q.   Without waiving your Fifth Amendment rights, Mr. Fisch,

15:03   15   is it true or not true that you had many discussions with

16   Mr. Portillo in which he divulged sensitive matters intended

17   for your attorney-client relationship only?

18           MR. PEARSON:   Objection, Your Honor.

19           THE COURT:   The problem is that's obviously been

15:03   20   waived by the --

21           MR. PEARSON:   Mr. Portillo has waived the

22   confidentiality privilege --

23           THE COURT:   With respect to Mr. Fisch.

24           MR. PEARSON:   To Mr. Fisch's representation --

15:03   25           THE COURT:   And Mr. Portillo has affirmatively not

        1    waived it with respect to Mr. Silverman.  He's done the

        2    opposite.  He's refused to waive it.  Counsel is here to

        3    assert it, in fact.

        4              So, I'm not sure what the relevance of that

15:04   5    is.  You have certainly argued -- We know there's a waiver.

        6    I don't think you need to risk the Fifth Amendment issue,

        7    because the point you're making is --

        8              MR. SILVERMAN:  -- established.

        9              THE COURT:  -- a matter of inference.

15:04   10             MR. SILVERMAN:  Then, I withdraw the question.

        11   Don't answer it.

        12             No questions.

        13                        CROSS-EXAMINATION

        14   By Mr. Pearson:

15:04   15   Q.  Sir, do you waive the claim of ineffective assistance of

        16   counsel with respect to Mr Silverman's prior representation

        17   of Mr. Portillo?

        18   A.  Yes, Mr. Pearson, I do.

        19   Q.  Do you waive any claim of --

15:04   20             THE COURT:  Is it waivable?

        21             MR. PEARSON:  I'm not sure, Your Honor.  That's why

        22   I am asking anyway.  I didn't want to take the Court's time,

        23   because I know we're on a short time frame, about delving

        24   into the legal issues.  I figured I would put it out there.

15:04   25   If it's not waivable, we'll deal with that issue when it

 1    arises.

 2         THE COURT:  I think the whole point of this hearing

 3    is not to allow that to arise.

 4         MR. PEARSON:  I understand that, Judge.  And, so, I

15:05   5    apologize for --

 6         THE COURT:  No.  No.  You shouldn't apologize.  I

 7    think it's a different way of asking the question --

 8         MR. PEARSON:  Right.

 9         THE COURT:  -- because what we're trying to do is

15:05  10    protect effective representation.

11         DEFENDANT FISCH:  Yes, Your Honor.

12         MR. PEARSON:  I understand that.  My first question

13    is about the effective assistance of counsel with respect to

14    Mr. Silverman's prior representation of Mr. Portillo.

15:05  15    By Mr. Pearson:

16    Q.  And my second question is:  Do you waive effective

17    assistance of counsel with respect to

18    Mr. Silverman's potential cross-examination of government

19    witnesses, whether it's Mr. Portillo or someone else at the

15:05  20    trial?

21         MR. SILVERMAN:  No, he does not waive right to

22    effective assistance of counsel of other witnesses.  I will

23    answer that for him.

24              No.  Don't answer.

15:05  25         DEFENDANT FISCH:  No.  I'm not answering.

1          MR. SILVERMAN:  It's not relevant.

2          THE COURT:  Are you ruling on the objection?

3          MR. SILVERMAN:  No.

4          THE COURT:  You're doing a good job.

15:06    5          MR. SILVERMAN:  A legal objection.  I just jumped

6    up.

7          THE COURT:  Yeah.  Yeah.  I would say so.

8              Why don't you reask the question in a way that

9    perhaps would be narrower.

15:06   10          MR. PEARSON:  Sure.

11   By Mr. Pearson:

12   Q.  With respect to cross-examination of witnesses based on

13   Mr Silverman's prior representation of Mr. Portillo.

14   A.  Cross-examining --

15:06   15              That doesn't make any sense to me, Your Honor.

16   I'm sorry.

17          THE COURT:  Other than Mr. Portillo?

18          MR. PEARSON:  The issue I am trying to cover is

19   both the cross of Mr. Portillo but, also, whether his

15:06   20   representation of Portillo led to information that he could

21   use to cross other witnesses.

22          DEFENDANT FISCH:  Mine or Mr. Silverman's, sir?

23          MR. PEARSON:  That's the issue that I am talking

24   about, Your Honor.

15:06   25          DEFENDANT FISCH:  I don't understand.

1          THE COURT:  Either rephrase it or move to the next

2     question.

3          MR. PEARSON:  Sure.

4     By Mr. Pearson:

15:06  5     Q.  The question is:  Do you waive your claim to ineffective

6     assistance of counsel based on Mr Silverman's knowledge that

7     he gained from his prior representation of Mr. Portillo?

8          MR. SILVERMAN:  That's asked and answered.

9          THE COURT:  Overruled.

15:07  10          You can answer the question.

11          DEFENDANT FISCH:  Yes, Your Honor.

12          MR. PEARSON:  Thank you, Your Honor.  That's all I

13     have.

14          THE COURT:  Anything else?

15:07  15          DEFENDANT FISCH:  From me, Judge?

16          THE COURT:  No.  From the lawyers.

17          MR. SILVERMAN:  No, ma'am.

18          THE COURT:  I take it -- again, an obvious question

19     for you, but just so our record is complete -- you are aware

15:07  20     of your right to have other counsel?

21          DEFENDANT FISCH:  Yes, Your Honor, I am.

22          THE COURT:  All right.  Any other questions?

23          MR. PEARSON:  Not from the government.  Thank you,

24     Your Honor.

15:07  25          THE COURT:  All right.  You may step down.

1          I think Mr. Fisch has, obviously, made a

2    knowing and intelligent waiver.  It's informed.  Mr. Fisch

3    is competent to make such a waiver.  So, on those grounds,

4    the waiver clearly passes muster.

15:08   5          The question is whether there should,

6    nonetheless, be a disqualification because of the nature of

7    the actual conflict that triggered the hearing or whether

8    there is an additional potential conflict that is itself a

9    ground for disqualification.

15:08   10          And, here, I think the case law is helpful,

11   that I do have the authority to refuse a waiver such as

12   Mr. Fisch's in the case of either actual or potential

13   conflict.  There has to be a showing of a serious potential

14   for conflict in order for me to override the presumption in

15:09   15   favor of counsel of one's choosing, and we all recognize

16   that.  But I do have an independent interest and obligation

17   to ensure the fairness of the trial even if there is a

18   waiver of conflict of interest, and that extends to the

19   ability to reject counsel of choice when the overall

15:10   20   circumstances suggest that a conflict may develop, a serious

21   conflict, and just as the court described in *Infante,* the

22   potential for a serious conflict when Mr. Portillo testifies

23   against Mr. Fisch, which I understand to be the expected

24   plan.

15:10   25          Mr. Portillo's sentencing has been delayed

1       years in order for him to be able to do this.  The result

2       will be, if Mr. Silverman is representing Mr. Fisch, to put

3       Mr. Silverman in a position conducive to divided loyalties.

4       He would have to choose between vigorously cross-examining

15:11   5       Mr. Portillo, which might jeopardize Mr. Portillo's ability

6       to get the sentencing benefit that he has apparently worked

7       hard to -- or committed to work hard to obtain or not

8       vigorously cross-examine Mr. Portillo, which would risk

9       allowing the government to establish, through Mr. Portillo's

15:11   10      testimony, an essential element of the case against

11      Mr. Fisch.

12              Mr. Silverman clearly has a potential for a

13      conflict of interest.  And even though Mr. Silverman says

14      that he can't think of any confidential information that

15:12   15      hasn't been divulged that he would use against Mr. Portillo,

16      what he's also described is ample opportunity to have

17      learned information that might -- as trial and testimony

18      develop, that might, at that time, reveal itself to be

19      helpful in ways that are not as apparent today.  That is

15:12   20      both likely and unpredictable.

21              That potential for a serious conflict -- and

22      it is serious because Mr. Portillo, apparently, has key

23      information and is a key witness important to the

24      government's case and, therefore, important to Mr. Fisch.

15:12   25      It is with great reluctance, because Mr. Silverman,

1   obviously, has mastered information about the case despite

2   the fact that he is a very recent addition to the case --

3   He's only served as counsel for a scant couple of weeks in a

4   case that is a week away from trial.

15:13   5        MR. SILVERMAN:  May I before you say the next

6   thing, Your Honor.  The decision that we have looked at,

7   *Lucio,* the judge was --

8        THE COURT:  Are you going to suggest that I

9   consider appointing counsel to conduct the

15:13   10  cross-examination?

11       MR. SILVERMAN:  Well, either that or --

12       THE COURT:  I thought about that.

13       MR. SILVERMAN:  -- that I attempt to locate --

14       THE COURT:  I thought about that, and my concern

15:13   15  with that is that Mr. Portillo and the evidence that I

16  understand he is likely to present is just too pivotal.  I

17  don't think that that would solve the problem.

18       MR. SILVERMAN:  Well, Your Honor, if I may.  The

19  thing that is distinguishing about this unique circumstance

15:14   20  is that Fisch, admittedly, spent countless hours talking to

21  Portillo about not only the things he's charged with in the

22  indictment to which he has entered a plea of guilty but all

23  other relevant conduct, all other crimes that Portillo had

24  any knowledge of, things that I have no idea about with

15:14   25  regard to Mr. Portillo.  I mean, Fisch's view --

1       THE COURT:  I understand there are a lot of unusual

2  factors.

3       MR. SILVERMAN:  And Fisch can share that with

4  another lawyer that we can either locate and arrange for or

15:14  5  that the Court could appoint, and that lawyer can handle the

6  Portillo portion of the case.  And I'm an officer of the

7  Court.  I won't even talk to that person.

8       THE COURT:  But, in a way, what you have just

9  described drives home the problem that we have.

15:15  10       You haven't allowed Mr. Fisch to share with

11  you the details of what Mr. Portillo told him.  Correct?  Is

12  that what you just told me?

13       MR. SILVERMAN:  We haven't gotten to that.  I would

14  be allowed to.  There is no prohibition against that.

15:15  15       THE COURT:  So, I misunderstood a little bit what

16  you were telling me.

17       MR. SILVERMAN:  No.  No.  If I cross-examine

18  Portillo, I would take full advantage of what Fisch tells me

19  because I am supposed to.  That's what makes this such an

15:16  20  odd situation.

21       THE COURT:  But that enhances the conflict and the

22  duty of loyalty that you owe still Mr. Portillo.

23       MR. SILVERMAN:  Because I don't use -- I mean, if

24  it was in a 302 I could cross-examine him with it.

15:16  25       THE COURT:  It's not limited to using confidential

1   information, although that is a key factor.  That's the

2   problem.

3          MR. SILVERMAN:  That's what makes this case so

4   strange, is that Fisch has access to --

15:16   5          THE COURT:  I understand that Mr. Fisch and

6   Mr. Portillo have a number of discussions under an attorney-

7   client rubric itself, which is -- There are lots of unusual

8   things that arise out of the fact that the defendant in this

9   case is a criminal defense lawyer and the prosecution arises

15:16  10   out of his work as a criminal defense lawyer and that some

11   of the witnesses are his former clients.  There are lots of

12   unusual factors that arise in the case.

13          Having said all of that, I continue to believe

14   that that is an inadequate cure for the structural problem

15:16  15   of having an attorney who has a prior attorney-client

16   relationship in a substantially related matter with a key

17   witness for the prosecution in this case.  So, that's -- I

18   just don't think that curative step is available here.

19          So, now I'd like to turn to the question of

15:17  20   what we ought to do next.

21          MR. JOHNSON:  Your Honor, what we said earlier is I

22   think there are two options.  Either Mr. Fisch can continue

23   representing himself as he's been doing for months or either

24   he can hire another lawyer or the government [verbatim]

15:17  25   could appoint a lawyer, and that lawyer would probably need

1    at least a little bit of time --

2              THE COURT:  Oh, yeah.  No.  He would need a little

3    bit of time.  What are you thinking?  30 days?  60 days?

4              MR. JOHNSON:  Less than that, Your Honor.

15:17   5    Mr. Silverman was able to get ready, get up to speed,

6    apparently, in about a week.

7              MR. SILVERMAN:  Mr. Silverman is not ready.

8    Mr. Silverman understands the global theories of the case.

9              THE COURT:  I think a minimum of 30 days is

15:17  10    generally what's given.  Nobody is more reluctant to do

11    this, I think you all know, than I am.

12              MR. SILVERMAN:  If I may, Your Honor.  I don't know

13    if I still have standing to be talking here.  I don't think

14    you have said the magic words yet, but --

15:18  15              THE COURT:  Well, I think I sort of have.

16              MR. SILVERMAN:  -- I get where you're going.  Okay.

17    May I still address the Court?

18              THE COURT:  You may still address the Court.

19              MR. SILVERMAN:  Thank you.

15:18  20              In light of the *Gonzalez-Lopez* case, this is

21    structural -- the right to attorney of choice, that is -- of

22    course, is now structural error, that there is no harm of

23    showing intended.

24              There is a case -- and I don't recall the

15:18  25    name -- post *Gonzalez-Lopez*.  It is not a federal decision.

1    It is a decision from the Ohio Supreme Court and it holds

2    that interlocutory appeal is --

3         THE COURT:  I'm not going to give an interlocutory

4    appeal.  We're going to go to -- That's buying years.  We're

15:19  5    not doing that.

6         MR. SILVERMAN:  No.  It could be on an expedited

7    schedule.  The right is existent now --

8         THE COURT:  I think the government has -- There is

9    an appealable issue built in here no matter how I rule.

15:19  10        MR. SILVERMAN:  Yes, Your Honor.

11        THE COURT:  And I think that it is unwise to simply

12   further elongate and delay these proceedings by any kind of

13   interlocutory appeal.

14        MR. JOHNSON:  And, Judge, the government's position

15:19  15   is a continuance -- if there is a new lawyer, we agree that

16   there should be a continuance.  We just want it to be as

17   short as possible.

18        THE COURT:  We'll, obviously, have to work out a

19   schedule, but I do think that 30 days is an appropriate

15:19  20   benchmark.  So, I am going to issue a new scheduling order.

21   We will not pick a jury in this case on Monday.

22             Do the parties still think it's a two-week

23   trial, roughly?

24        MR. JOHNSON:  Yes, Your Honor.

15:20  25        MR. SILVERMAN:  Judge, I guess it doesn't matter

1    what I think any longer, but I will tell you that this is

2    going to -- with any competent lawyer that gets into this

3    evidence, this is going to be longer than two weeks.

4    There's many, many, many, many recorded conversations that

5    are highly relevant, and I am just advising you of that.

6    It's going to be longer.

7            THE COURT:  I didn't say how long a trial day was.

8            MR. SILVERMAN:  Yes.  That's true.  Why don't we

9    just sit back and eat popcorn and listen to tapes until

10   10:00 at night?  Yes.  I understand.

11           THE COURT:  All right.  But that's helpful.

12           MR. SILVERMAN:  Yes, ma'am.

13           THE COURT:  Mr. Fisch, when Mr. Silverman appeared,

14   it made clear that, as we knew, you know lots of very good

15   defense lawyers and they are not in short supply in Houston,

16   Texas, and I was delighted that you were willing, at long

17   last, to be represented by one of the fine members of the

18   criminal defense bar here in Houston.  I urge you to do that

19   promptly.

20           We have a 30-day window in which to work.  I

21   will issue a revised scheduling order that will allow --

22           DEFENDANT FISCH:  Can I address the Court, Your

23   Honor?

24           (Mr. Silverman confers with Defendant)

25           MR. JOHNSON:  Your Honor, the government would ask

1    that there be a deadline by which Mr. Fisch announces his

2    new attorney.

3        THE COURT:  What's the government's notion of a

4    reasonable time for that to occur?

15:22  5        MR. JOHNSON:  Five days.  Six days.

6        THE COURT:  No.  I may give him two weeks and then

7    30 days after that before we begin.

8        MR. JOHNSON:  And our understanding is that --

9        THE COURT:  And no new motions.

15:22  10        MR. JOHNSON:  -- the pretrial motions deadline has

11   run, as has the Rule 12 notice deadline, as has the deadline

12   for turning over recordings to the government.

13        MR. SILVERMAN:  Judge, that would effectively --

14   and I am just as a commentator here now -- but that would

15:22  15   effectively gut any chance at all that anybody has of fairly

16   informing the jury as to what really happened in this case,

17   and to have --

18        THE COURT:  No.  No.  That's an argument for new

19   counsel to make if new counsel wants to make it, number one.

15:23  20   And, number two --

21        MR. SILVERMAN:  I'm sorry.  I just can't stop being

22   a lawyer.  I'm sorry.

23        THE COURT:  And, number two, if there are specific

24   issues that counsel wants to bring to my attention, I will

15:23  25   deal with specific issues.  I am not going to, in the

1    abstract, take on what somebody might argue two weeks, three

2    weeks, down the pike.

3              MR. SILVERMAN:  Yes, Your Honor.

4              THE COURT:  But what we need is a new lawyer or a

15:23   5    statement on Mr. Fisch's part that he chooses to proceed

6    pro se, and 30 days after that I'm looking at going to

7    trial.

8                   We do have another case that is scheduled that

9    we're going to have to wire around.  That may add more time.

15:23  10   Mr. Fisch won't complain if that occurs.  I don't know

11   what's going to happen in that case, obviously.

12                  But scheduling -- one of the reasons I was

13   reluctant to continue this case, besides the history of

14   the -- I think this makes the tenth continuance -- is the

15:24  15   difficulty in rescheduling, and it's just a fact of a

16   crowded docket.  So, we'll deal with it.

17                  Anything further for today?

18              MR. PEARSON:  May I have just a moment, Your Honor.

19              MR. JOHNSON:  Judge, our suggestion is that there

15:24  20   be -- once Mr. Fisch announces who his new lawyer will be or

21   if he's proceeding pro se, that we have a status conference

22   just for scheduling purposes.

23              THE COURT:  Oh, sure.  I agree.

24              MR. JOHNSON:  Because we have to coordinate

15:25  25   witnesses --

1            THE COURT:  I am going to set a status conference

2       for the expiration of the two-week period one way or

3       t'other.

4            MS. CRISWELL:  Your Honor, may I address the Court

15:25   5       briefly?

6            THE COURT:  Yes, ma'am.

7            MS. CRISWELL:  In the government's response to our

8       pretrial motions they had represented that they would be

9       turning over grand jury transcripts two weeks before trial,

15:25   10      as well as promise and agreements that they made to the

11      criminal defendants who are going to testify.  We have not

12      received any of that information and that would have been

13      this past Monday.  So, I just wanted to make that point to

14      the Court, that we haven't received the information that

15:25   15      they represented they would turn over to us.

16           THE COURT:  All right.  Well, now you know another

17      window.

18               I take it the government will confer with

19      counsel for Miss Bertman and work out whatever obligations

15:25   20      for providing information remain.

21           MR. PEARSON:  We'll be happy to do that, Your

22      Honor.

23           THE COURT:  Thank you very much.

24

25

1                      COURT REPORTER'S CERTIFICATE

2            I, BRUCE SLAVIN, certify that the foregoing is a

3    correct transcript from the record of proceedings in the

4    above-entitled matter, to the best of my ability.

5

6                                   *s/Bruce Slavin*
                                    BRUCE SLAVIN, RPR, CMR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25